**Artis JACKSON, Petitioner,**

v.

**UNITED STATES of America,
Respondent.**

**Civ. A. No. 37–70.**

United States District Court,
D. New Jersey.

Jan. 7, 1971.

Rehearing Denied Feb. 24, 1971.

Supplemental Opinion Feb. 26, 1971.

Petitioner appeared pro se.
No appearance for respondent.

### MEMORANDUM and ORDER

AUGELLI, Chief Judge:

This is a forma pauperis application filed pursuant to 28 U.S.C. § 2255 to vacate the judgment of conviction and sentence imposed upon petitioner on November 10, 1966, in Criminal Action No. 120–66.

Petitioner and three other individuals (Eugene Boone, Harold L. Howard and Vincent J. Loffa) were charged in a three-count indictment with a violation of 18 U.S.C. § 2113(a), (b) and (d) in connection with the March 9, 1968 robbery of the Rahway Avenue Branch of the Union County Trust Company in Elizabeth, New Jersey, a federally insured bank. Count I of the indictment charged the defendants with the unlawful taking of $59,505.06 from the Branch; Count II alleged the use of force and intimidation in effecting the unlawful taking; and Count III charged the defendants with putting lives in

jeopardy by the use of dangerous weapons in the commission of the robbery. Petitioner pleaded not guilty to each count of the indictment. His codefendant Boone pleaded guilty to Counts I and II, and codefendants Howard and Loffa pleaded guilty to Count I.

Petitioner's first trial, before Judge Coolahan, commenced on June 28, 1966, but ended in a jury disagreement. The second trial, presided over by Judge Wortendyke, resulted in a jury verdict of guilty on all three counts of the indictment, following which Judge Wortendyke sentenced petitioner to the term he is now serving. On appeal, the conviction was affirmed. United States v. Boone, 401 F.2d 659 (3 Cir. 1968). Thereafter, petitioner applied to Judge Wortendyke for a vacation of his sentence and for other relief. The application was denied, except for correction of the sentence imposed upon petitioner to reflect the merger of the offenses alleged in Counts I and II of the indictment with the more aggravated offense charged in Count III. See opinion and order filed September 18, 1969, in Artis Jackson v. United States of America, Civil Action No. 785–69. This was followed by the present 2255 application, which was accompanied by petitioner's affidavit charging Judge Wortendyke with "personal bias or prejudice", and requesting that the Judge disqualify himself from hearing the matter. Thereupon, Judge Wortendyke voluntarily disqualified himself, and the entire file in this case was transferred to the writer of this memorandum for review and determination of the issues raised by petitioner.

In support of his charges of personal bias or prejudice, petitioner alleges that Judge Wortendyke showed such "deep prejudice" against petitioner during the course of the trial as to deprive him of a fair trial; that the Judge permitted evidence to be used against petitioner that was known to be false by the prosecution; and that the Judge denied petitioner a fair trial and equal justice because he was a "poor negro". This Court has made a painstaking examination of the complete record in this case and finds absolutely no basis in fact to justify, even remotely, the charges levelled against Judge Wortendyke. Consideration will now be given to the grounds asserted by petitioner for relief under 28 U.S.C. § 2255.

Petitioner claims to be entitled to a hearing on his 2255 application, and in connection therewith requests that counsel be assigned to him and witnesses subpoenaed to testify in his behalf. Petitioner alleges that such a hearing will establish a violation of his constitutional rights and result in the grant of a new trial or his release from custody. The particulars in which petitioner's constitutional rights have been violated, are said to be the following:

1. petitioner's arrest was effected without a warrant or probable cause;

2. the prosecution knowingly used perjured testimony to obtain petitioner's conviction;

3. out-of-court photographic identification of petitioner, in the absence of counsel, violated his right to counsel under the Sixth Amendment; and

4. petitioner was given a harsher sentence than his codefendants because he would not waive his Fifth Amendment right to a jury trial.

Petitioner's claim that he is entitled to relief because he was arrested without a warrant or probable cause, is without merit. There was more than a sufficient showing of probable cause to justify the arrest without a warrant. Petitioner was arrested on the basis of information supplied by his codefendants. They informed the arresting officers that petitioner participated in the bank robbery with them. Moreover, even assuming that the arrest was illegal, it does not appear from the record that the arrest in any way affected the fairness of petitioner's trial and subsequent conviction. No confession by petitioner or other evidence emanating from him during any alleged period of unlawful detention found its way into the trial. The

arrest was not related to an illegal search and seizure such as in the case of Kaufman v. United States, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969). There is only the bare allegation of an illegal arrest. Such an arrest, without more, does not void a conviction and is not grounds for a collateral attack under 28 U.S.C. § 2255. Moreland v. United States, 347 F.2d 376 (10 Cir. 1965); Hayes v. United States, 419 F.2d 1364 (10 Cir. 1969).

 Petitioner's second ground, that his conviction was obtained by the use of perjured testimony, is likewise without merit. The charge here is that the bank employee, Gabriel Bergamo, and petitioner's codefendants, Howard and Loffa, committed perjury when they testified at petitioner's trial; that this was known to the prosecution; and that such perjured testimony was deliberately used to aid in obtaining petitioner's conviction. In order to prevail on this ground, the burden is on petitioner to show that the witnesses' testimony was, in fact, perjured; that the perjured testimony was material to the conviction; and that the prosecution either participated in or had knowledge of the perjury. United States v. Spadafora, 200 F.2d 140 (7 Cir. 1952); Dansby v. United States, 291 F.Supp. 790 (S.D.N.Y.1968). There can be no quarrel with the proposition that the knowing use of perjured testimony by the prosecution violates due process of law. Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

 A careful reading of the record discloses nothing more than minor and inconsequential variations in the testimony given by the witness Bergamo in the first and second trials of petitioner. It is alleged that Bergamo perjured himself at the second trial when he testified as to the manner in which the robbery was carried out and his ability to view the robbers. The variations dealt with minutiae and not substance. Petitioner stresses the fact that at the first trial, Bergamo testified that his view of petitioner lasted only 1½ seconds, whereas, at the second trial, Bergamo said it was of longer duration, to wit, 1½ minutes. Bergamo was extensively and thoroughly cross-examined by petitioner's counsel concerning this and other minor differences between his testimony at the first and second trials. The weight to be given to Bergamo's testimony was for the jury to decide. By no stretch of the imagination can it be said that such inconsistencies as did appear in Bergamo's testimony were even remotely indicative of perjury, or, a fortiori, that the prosecution made knowing use of "perjured" testimony. See Chapman v. United States, 408 F.2d 11 (2 Cir. 1969).

As to Howard and Loffa, who implicated petitioner in the crime, the broad allegation is made that they perjured themselves in return for a promise of leniency by the prosecution. Indicative of this, claims petitioner, is the fact that both men were permitted to tender guilty pleas to only Count I of the indictment, which pleas were accepted by the Court, and that subsequently Counts II and III were dismissed on motion of the Government as to each codefendant.

In the case of Howard, much stress is laid on a letter dated July 29, 1966, sent by Mr. Baime, the Assistant United States Attorney who conducted the first trial against petitioner, to Judge Coolahan, who presided at that trial. A copy of that letter was mailed to Howard by Mr. Baime. The letter calls attention to the fact that Howard was one of the defendants who had originally agreed to testify for the Government at petitioner's first trial, but that he later "reneged on his promise." The letter goes on to say that the Government intended to allow Howard to retract his former plea of guilty to Count I of the indictment and to try Howard on all three counts. At petitioner's second trial, before Judge Wortendyke, which was conducted by another Assistant United States Attorney, Howard did testify for the Government and implicated petitioner in the bank robbery. Petitioner argues that Howard's testimony at the second trial, when viewed in light of the letter of July 29,

1966, is tantamount to an admission by Howard that he would "sell his testimony to the prosecution" in exchange for a deal whereby he would escape the consequences of the offenses charged against him in Counts II and III of the indictment.

█ Despite vigorous efforts made by defense counsel to show the existence of a "deal", Howard just as vigorously denied any promises were made to him, such that if he entered a plea of guilty to Count I of the indictment and testified against petitioner, the other counts would be dismissed. Moreover, Howard denied that his decision to testify for the Government was in any way related to the letter of July 29, 1966, or that he made up his mind to do so only after he received a copy of said letter. A perusal of Howard's testimony makes it clear that he refused to testify for the Government at petitioner's first trial because he "wanted a deal" and that since the prosecution did not promise him anything, he refused to testify and "reneged on the stand." What eventually motivated Howard to testify against petitioner is the fact that he received only $7500.00 as his share of the money stolen from the bank, instead of $15,000.00. As stated by Howard:

> "Had Mr. Jackson [petitioner] been man enough—to give me the balance of my money to my mother or to my common law wife for my children, I would definitely not be here today. This is my reason for being here. There is no deal with the Government, no promises, no deal with the Government. This is where one bad hand washes the other."

As to Loffa, who testified for the Government at both trials, it is alleged that all of his damaging testimony was perjurious, and that such testimony was induced by a promise by the prosecution that if Loffa testified against petitioner, the Government would accept a plea of guilty to Count I of the indictment and dismiss the other two counts. In support of this charge, petitioner stress-

es Loffa's extensive prior criminal record, and also his confusion, when cross-examined as to whether he had pleaded guilty to one or more counts of the indictment. It is also pointed out that at the first trial Loffa gave only one reason, and that was his inability to make bail, for testifying against petitioner, whereas, at the second trial, he added an additional reason for doing so, and this was because he did not get his full share of the stolen bank money. Like Howard, Loffa testified he received only $7500.00 of the loot instead of $15,-000.00. Loffa denied that any deal was offered to him by the Government to induce him to testify against petitioner, although he did admit he hoped "to get a break" by pleading guilty.

When pressed on cross-examination to tell why he changed his plea from not guilty to guilty, Loffa said:

> "Well, sir, if you will let me say the reason I changed my plea, or when I decided to change my plea is because I talked to Artis Jackson [petitioner]. I asked him about the rest of this money and he told me there was no more money. I found out different, that there was $60,000 involved in the bank and I only got $7,500, which I got beat for $7,500. I says to him that I want the rest of my money. He said that I am not getting it. Therefore, I just—I didn't get anything out of it. I just pleaded guilty to the case."

Reference is also made by petitioner to the testimony of defense witnesses Joseph Christinizio, Arlington Hobson, and Eugene Boone.

Christinizio was an inmate of the Mercer County Jail during Loffa's period of incarceration therein. Christinizio testified that he and Loffa had a general conversation about a bank robbery (name of bank and date of robbery not discussed), and that in the course of their conversation Loffa mentioned the names of Howard and Boone but not the name of petitioner. This witness also said that Loffa made mention of a "third man", without naming him; that this

individual had $25,000.00 belonging to Loffa; that the authorities would never apprehend that person; and that Loffa would never turn him in regardless of the consequences. Petitioner points to this testimony to bolster his claim that Loffa lied when he testified he had a conversation with petitioner about the division of the bank robbery money, and also to show that Loffa used petitioner as the "fall guy" for the unnamed "third man" mentioned by Loffa to Christinizio.

Hobson, a member of the Elizabeth Police Department, testified that he was on patrol duty on March 9, 1966, the date of the bank robbery, and that he saw petitioner some time between 9:35 and 9:50 of the morning of that day. Hobson said he had no conversation with petitioner, the latter being in an automobile when the observation was made. Petitioner, erroneously stating that Hobson testified he saw petitioner "about 9:30 A.M.", invites the Court's attention to the testimony of the bank employee, Bergamo, who said the bank robbery took place between 9:00 and 9:15 A.M. on March 9, and argues that a consideration of the time it took to rob the bank, to make a getaway, to reach the apartment, and to divide the money, leads to the conclusion that petitioner was not involved in the crime, and that "Howard and Loffa were covering the tracks for the real associate, in hopes that they would get a short sentence" and then get out and share in the missing $25,000.00 referred to by Loffa in his conversation with Christinizio.

Boone, it will be recalled, was a co-defendant in this case. In a statement given to the Federal Bureau of Investigation, Boone, like Howard and Loffa, implicated petitioner in the bank robbery. At petitioner's first trial Boone, like Howard, refused to testify. At the second trial Boone testified for the defense. He repudiated the statement previously given to the F.B.I., and claimed said statement was signed only after he had been promised leniency if he would cooperate with the Government and implicate petitioner in the crime, and also to avoid the threatened arrest of his girl friend. In his testimony given at the second trial, Boone admitted he was one of the bank robbers; that the automobile used in the robbery was driven by Loffa; that petitioner was not at all involved in the crime; and that the three men who entered the bank were himself, Howard, and one "Ricky".

In addition to Boone, Hobson and Christinizio, other witnesses testified on behalf of petitioner, including his two sisters. Their testimony, like that of other defense witnesses, attempted to establish an alibi for petitioner or to cast doubt that he was one of the bank robbers. Much of the testimony was conflicting. Loffa and Howard testified that petitioner was one of the bank robbers. Boone, after first saying the same thing, later testified petitioner was not involved in the robbery. It was uncontradicted that four men participated in the robbery, and that Loffa drove the getaway car, while three men entered the bank. Boone's testimony and that of Christinizio attempted to show that one "Ricky", and not petitioner, entered the bank with Howard and Boone and committed the robbery. Petitioner himself did not testify. Loffa, Boone, Howard, and Christinizio, all had prior criminal records. The cross-examination of these witnesses was vigorous and thorough. Loffa, Boone, and Howard were accomplices. Judge Wortendyke, in his charge to the jury, was careful to point out that the credibility of the witnesses who testified in the case was a matter for the jury to decide. As to accomplices, the jury was instructed that the testimony of accomplices was to be received with caution and weighed with great care, and that a defendant was not to be convicted upon the unsupported testimony of an accomplice unless such testimony was believed by the jury "beyond all reasonable doubt." Here there was much more than the unsupported testimony of an accomplice. The record as a whole furnishes more than ample support for the jury verdict of guilty in this case. The proofs fall far short of establishing peti-

tioner's claim of perjury. While it may be true that Howard and Loffa hoped for leniency in testifying as they did, there is absolutely no proof that the Government made any promises, by a deal or otherwise, in exchange for their testimony. And it is preposterous, on this record, to even suggest that the prosecution made knowing use of "perjured" testimony in order to obtain petitioner's conviction. What petitioner characterizes as "perjured" testimony was nothing more than testimony which implicated him in the crime. It was for the jury to determine how much credibility was to be given to the witnesses who testified. Under proper instructions from the Judge, the jury concluded petitioner was one of the bank robbers, and as already stated, the record amply supports this conclusion.

The next ground for relief urged by petitioner relates to the photographic out-of-court identification made of him while he was in custody, and in the absence of counsel. The identification was made on March 18, 1966, by employees of the robbed bank, namely, Gabriel Bergamo, the manager, and tellers Dolores Mooney and Margaret Link.

Petitioner was arrested on March 9, 1966, the day of the robbery. On that same day, following the robbery, F.B.I. Agent Hart, who was in charge of the investigation of the crime, exhibited to the bank employees a "bank robbery album" containing, according to Hart, 80 or 90 pictures of individuals who had previously been convicted of bank robbery or armed robbery. Petitioner's picture was not among those in the album, and hence the bank employees made no identification on that day. Thereafter, on March 18, Agent Hart brought to the bank and exhibited to the same employees, 12 additional photographs, all of male Negroes. Petitioner's photograph was in this group, and said employees selected petitioner's picture and identified him as one of the bank robbers. Contrary to what is alleged by petitioner to be a possibility, the record is clear that the pictures in

the album, as well as the 12 loose photographs, were exhibited separately to each bank employee, and not shown to them in the presence of each other or as a group.

At the trial, the bank employees testified concerning the opportunities they had to observe the bank robbers. With respect to petitioner, the testimony of these witnesses, as might be expected, varied somewhat as to his height and weight, but there was substantial agreement on other indicia of identification. Bergamo particularly noted petitioner's nose and eyes. Miss Link testified she was able to observe petitioner "most of the time he was there", and that he was a "heavyset negro male" with a "broad nose", which to her seemed "broader than most of them." Miss Mooney testified she was only three or four feet away from petitioner and "looked at him several times." She also said petitioner was "very muscular, built like a fighter, and he had a broad flat nose." Parenthetically, it may be noted that there was testimony in the case that petitioner was, in fact, a "good boxer." All of the bank employees made positive in-court identifications of petitioner as one of the bank robbers. The major point made by petitioner, however, on this aspect of the case, is that his counsel was not present at the time of his photographic identification on March 18.

The right to counsel in line-up cases, mandated by United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), extends as well, in this Circuit, to photographic identification of a suspect after he is in custody. United States v. Zeiler, 427 F.2d 1305 (3 Cir. 1970). Wade and Gilbert were decided on June 12, 1967, but the constitutional rule established by those decisions has application only to cases involving confrontations for identification purposes conducted in the absence of counsel after that date. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed. 2d 1199 (1967). Since the photographic identification of petitioner in this case

occurred long prior to June 12, 1967, the Wade, Gilbert, and Zeiler cases are not applicable. However, it is still incumbent upon this Court to determine whether the manner of conducting the out-of-court photographic identification of petitioner in the absence of counsel was so unnecessarily suggestive and conducive to irreparable mistaken identification as to deprive him of due process of law. This is a recognized ground of attack on a conviction, independent of any right to counsel claim. Stovall v. Denno, supra. In this connection the Court is obliged to examine the "totality of the circumstances" surrounding the out-of-court identification procedure.

With respect to the photographic identification procedure followed on March 18, Special Agent Hart testified that the 12 pictures he exhibited to the bank employees on that day were shown to each of them individually, and that they were asked if they could pick out of that batch the photograph of any individual who had been in the bank during the robbery on March 9. Hart said he then walked away from the desk on which he had spread the pictures and allowed each employee plenty of time to look them over, and that no suggestion was made to any of the employees as to which of the photographs might be those of the men or one of the men who robbed the bank. This witness further testified that Miss Link and Miss Mooney both positively identified the photograph of petitioner as being one of the bank robbers, and that as to Bergamo, that individual was "pretty sure" of his identification of petitioner.

Bergamo testified that no suggestions were made to him when he was shown the 12 pictures on March 18, and Miss Link's testimony was to the same effect. She, as well as Miss Mooney, confirmed Hart's testimony concerning the individual examination of the pictures exhibited on March 18.

Petitioner seizes upon Miss Mooney's answer to a question on cross-examination to establish that an improper and suggestive identification procedure was used by the F.B.I. On direct examination this witness testified that she was taken individually to the desk on which the 12 pictures were spread; that she selected only one of them; and that the one she selected was a photograph of petitioner. On cross-examination Miss Mooney was asked: "[D]id the investigating officers * * * suggest to you that in the group of photographs that you were shown on March 18, the defendant Artis Jackson and pictures of the other two men were the ones they thought were involved and that you could identify them or see if you could identify them?" To this question, the witness gave an affirmative answer. Contrary to petitioner's positive assertion, it is not entirely clear from this question and answer that petitioner was, in fact, suggested to Miss Mooney as one of the bank robbers.

In the totality of the circumstances disclosed by the record in this case, it cannot be said that the positive in-court identifications made of petitioner were in any way tainted or influenced by the prior out-of-court photographic identifications made by the bank employees. Even if it be assumed that Miss Mooney's affirmative answer to the question put to her on cross-examination is indicative of improper identification procedure, it does not necessarily follow that her in-court identification of petitioner was tainted thereby. This witness, as stated earlier in this memorandum, testified that she was only three or four feet away from petitioner at the time of the robbery, and that she "looked at him several times." She thus had an "independent source" upon which to base her in-court identification of petitioner. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149. In any event, and at the very most, Miss Mooney's in-court identification of petitioner, in view of other identification testimony in the case, could amount to no more than harmless error. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967).

It is also evident that the in-court identification of petitioner made by the other bank employees, Mr. Bergamo and Miss Link were not tainted by their earlier selection of petitioner's photograph as one of the bank robbers. Both had sufficient opportunity to observe petitioner as one of the participants in the bank robbery. Bergamo, as previously mentioned, testified to a view of 1½ minutes, and Miss Link said she was able to observe petitioner for most of the time he was in the bank. These viewing opportunities, coupled with the testimony of the bank employees concerning petitioner's physical features, clearly furnished a sufficient independent source to support the in-court identifications made of petitioner by these witnesses. But aside from all this, and most importantly, the identity of petitioner as one of the bank robbers was established by the testimony given in court by his two codefendants, Howard and Loffa. Thus, even if any infirmity did exist in connection with the photographic identification of petitioner, the admission of any testimony relating thereto would be mere harmless error when measured against petitioner's identification as one of the bank robbers by two of the men who admitted robbing the bank, and who named petitioner as one of the participants. Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968); United States v. Satterfield, 410 F.2d 1351 (7 Cir. 1969).

▆▆▆▆ Petitioner's final ground for relief, alleging that he was discriminated against and given a harsher sentence than his codefendants because he would not waive his Fifth Amendment right to a jury trial, is frivolous and lacking in substance. It is well settled that a court may, within the limits prescribed by law, exercise its discretion in imposing sentence upon a defendant. United States ex rel. Thompson v. Rundle, 294 F.Supp. 933 (E.D.Pa.1968). There is no constitutional requirement that identical punishment be meted out for like crimes. Williams v. Oklahoma, 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959). Peti-

tioner received a sentence of 20 years upon his conviction under all three counts of criminal indictment No. 120–66. His codefendants Howard and Loffa were sentenced to 8 and 7 years, respectively, on their pleas of guilty to Court I of the indictment, following which Counts II and III were dismissed against them. Codefendant Boone, on his pleas of guilty to Counts I and II of the indictment, was sentenced to a prison term of 12 years, followed by a dismissal of Count III against him. These disparate sentences are stressed by petitioner to support his claim that he was discriminated against and given a heavier sentence than his codefendants because he refused to plead guilty and demanded a jury trial. A similar argument was made and rejected in Green v. United States, 334 F.2d 733 (1 Cir. 1964), where the Court, at page 736 said:

> "The only remaining contention is that Green was discriminated against because after trial he was given a longer sentence than a co-defendant who pleaded guilty to one count of the indictment on the understanding that as to him the other two counts would be dismissed and who thereafter testified for the prosecution. It is too frivolous to merit discussion."

Petitioner's reliance on United States v. Tateo, 214 F.Supp. 560 (S.D.N.Y.1963), is misplaced, since in that case the judge coerced a plea of guilty by threatening to impose the maximum sentence if the defendant was convicted at trial. Here, there was no such coercion. Petitioner pleaded not guilty and went to trial. There is simply no factual basis in the record to even arguably support petitioner's contention that he was given a harsher sentence than the sentences imposed upon his codefendants simply because he asserted his right to a jury trial. Petitioner's trial, conviction, and sentence are not at all related to the guilty pleas and the sentences meted out to his codefendants. Although petitioner and his three codefendants were all indicted for the same bank robbery, they were not sentenced under identical sec-

tions of 18 U.S.C. § 2113. Petitioner's maximum exposure under 18 U.S.C. § 2113(d) was 25 years. His codefendants pleaded guilty to other sections of the statute carrying maximum prison terms of lesser periods. But even in cases where plural defendants are convicted of the same offense, a court is justified, after considering all mitigating and aggravating circumstances that are relevant to the sentencing process, in imposing disparate sentences. United States ex rel. Huntt v. Russell, 285 F. Supp. 765 (E.D.Pa.1968), aff'd 406 F.2d 774 (3 Cir. 1969); United States v. Vita, 209 F.Supp. 172 (E.D.N.Y.1962); Baysden v. United States, 213 F.Supp. 623 (E.D.N.C.1963), aff'd 326 F.2d 629 (4 Cir. 1964).

A consideration of this record as a whole leads to the conclusion that what petitioner really seeks is a retrial of his case. He asks this Court to summon as witnesses ten individuals, all of whom have already testified, four on behalf of the Government, and six for petitioner. Petitioner would be entitled to a hearing, and relief in the form of a new trial or release from custody, only in the event the record discloses a violation of his constitutional rights. But such is not the case here. Applying the standard laid down in 28 U.S.C. § 2255, the Court finds that the file and records of this case "conclusively show" that petitioner, for the reasons stated in this memorandum, is entitled to no relief on any of the grounds asserted in his petition. Under the circumstances, petitioner's application for relief under 28 U.S.C. § 2255 will be denied in all respects, and it is so

Ordered, this 7th day of January, 1971. And the Court further certifies that no probable cause for appeal exists in this case.

## ON MOTION FOR REHEARING

By Memorandum and Order filed in this action on January 7, 1971, petitioner's application, made pursuant to 28 U.S.C. § 2255, to vacate the judgment of conviction and sentence imposed upon him on November 10, 1966, in Criminal Action No. 120–66, was denied. A notice of appeal from this determination was filed with the Clerk of the Court on January 21, 1971.

On February 9, 1971, petitioner filed with the Clerk a motion for rehearing only with respect to "point one" of his original application, and in connection therewith requested that the record in his case not be sent to the Court of Appeals pending decision on said motion. The "point one" referred to by petitioner was based on the claim that his arrest was effected without a warrant or probable cause. On February 17, petitioner filed another motion, supplementing and amending his first motion for a rehearing. This second motion expands petitioner's argument that his arrest was illegal. He also, with changes in verbiage that do not affect substance, asks for a reconsideration of the several grounds that were urged for relief in the original application.

Just prior to the time petitioner's second motion came to the Court's attention, a Memorandum and Order had already been prepared, denying relief on the illegal arrest issue. A copy of that Memorandum and Order is annexed hereto and made part hereof. The Court has again patiently reviewed the record in this case in light of petitioner's motions. There is no basis in fact or in law that would justify a change in any of the conclusions reached by the Court as to any of the grounds urged by petitioner for relief.

For the reasons stated in the Memorandum and Order filed in this action on January 7, 1971, as supplemented by this memorandum, petitioner's motions for rehearing should be denied, and it is so

Ordered, this 24th day of February, 1971. And the Court certifies there is no probable cause for an appeal.

## ON SECOND MOTION FOR RE-HEARING

By Memorandum and Order filed in this action on January 7, 1971, petition-

er's application, made pursuant to 28 U.S.C. § 2255, to vacate the judgment of conviction and sentence imposed upon him on November 10, 1966 in Criminal Action No. 120–66, was denied. A notice of appeal from this determination was filed with the Clerk of the Court on January 21, 1971.

On February 9, 1971, petitioner filed with the Clerk a motion for rehearing as to "point one" of his original application, coupled with the request that the record in his case not be sent to the Court of Appeals pending decision on said motion.

The "point one" referred to by petitioner was based on the claim that his arrest was effected without a warrant or probable cause. Attached to petitioner's motion papers are copies of the complaint filed with the United States Commissioner on March 9, 1966, and the warrant for petitioner's arrest issued and executed on the same date. Petitioner was indicted for bank robbery on March 23, 1966. For the reasons stated in the Memorandum filed in this action on January 7, 1971, the motion for rehearing will be denied. Even if it be assumed that petitioner's arrest was illegal, that fact, standing alone, would not be sufficient to void his conviction. In addition to the federal cases cited in the aforementioned Memorandum, see also Commonwealth of Pennsylvania ex rel. Craig v. Maroney, 348 F.2d 22, 28 (3 Cir. 1965) and United States of America, ex rel. Bishop v. Rundle, 437 F.2d 204 (3 Cir. 1971). Once more it must be stressed that a careful examination of the trial record in this case conclusively shows that the alleged illegal arrest and detention of petitioner in no way affected the fairness of petitioner's trial or deprived him of any constitutional safeguards.

The motion for rehearing is hereby denied.

### SUPPLEMENTAL OPINION

In furtherance of his motions for a rehearing in this case, denied by Memorandum and Order filed February 24, 1971, petitioner has now filed, for the Court's consideration, two affidavits made by fellow inmates. These affidavits, says petitioner, are submitted as further proof "of the prejudicial effects the illegal arrest and denial of a preliminary examination" had on his trial and conviction.

The first affidavit, by one James C. Chester, refers to a conversation he overheard between Harold Howard (one of the bank robbers indicted with petitioner) and a woman who visited him in the detention pen in Newark. Howard is alleged to have told the woman that he had been "crossed" by the United States Attorney in that he did not receive the 5 year sentence that had been promised him by that individual, but instead received an 8 year sentence. The affidavit then goes on to say that after Howard's visitor left, the affiant asked Howard what had happened. Howard is alleged to have told the affiant about a promise made to him by the United States Attorney that if he, Howard, would testify for the Government and implicate petitioner in the bank robbery, the United States Attorney would recommend to the Judge a 5 year sentence, and that the United States Attorney failed to do so.

This whole matter of an alleged deal between Howard and the Government was thoroughly explored at the trial of the case, as were the circumstances surrounding Howard's implication of petitioner in the commission of the bank robbery and the reasons therefor. See pp. 5, 6 of Memorandum and Order filed in this action on January 7, 1971. The Chester affidavit adds nothing new to the case and is of no legal significance.

The second affidavit, by one Robert Paul Edwards, is likewise of no value to petitioner. The bank robbery in this case took place on March 9, 1966, between 9:00 and 9:15 A.M. The gist of the Edwards affidavit is that the affiant greeted petitioner at about 8:55 A.M. on March 9, as he was about to enter a building housing a pool room, and that he again spoke to petitioner when the latter left the building at about 9:15 to 9:20 A.M. This affidavit, if

believed, represents but a tiny bit of cumulative testimony on a phase of the case that was fully developed at the trial. The testimony of a number of witnesses called by petitioner, including his two sisters, attempted to establish an alibi for him or to create doubt that he was one of the bank robbers. See references to the testimony of Boone, Hobson and Christinizio in the Memorandum and Order filed in this action on January 7, 1971.

For the reasons stated herein, the Court finds that the affidavits of James C. Chester and Robert Paul Edwards, submitted by petitioner in support of his motions for a rehearing, are legally insufficient to warrant any change in the decision heretofore reached that the motions for rehearing be denied.

It is, therefore, on this 26th day of February, 1971,

Ordered, that this Court's order of February 24, 1971, denying petitioner's motions for a rehearing in this case, be and the same hereby is, affirmed.