**UNITED STATES of America, Appellee,**

v.

**Alfred G. BIBERFELD, Appellant.**

No. 91–5308.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule 12(6)
Oct. 15, 1991.

Decided Feb. 26, 1992.

Alfred G. Biberfeld, pro se.

Michael Chertoff, U.S. Atty., Newark, N.J., for appellee.

Before MANSMANN, HUTCHINSON, and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

Federal prisoner Alfred Biberfeld moved pursuant to 28 U.S.C. § 2255 to vacate his sentence or, in the alternative, for a new trial. The district court denied Biberfeld's motion without a hearing, holding that the record conclusively showed he was not entitled to relief. We review the district court's order in three steps. First, we decide whether Biberfeld has alleged facts which, if proved, would entitle him to some relief. *Smith v. Freeman*, 892 F.2d 331, 338 (3d Cir.1989). If so, we then decide whether he has waived his right to relief by failing to act upon it at trial. *Brown v. United States*, 556 F.2d 224 (3d Cir.1977). If not, we then decide whether an evidentiary hearing is necessary to test the truth of Biberfeld's allegations. *Smith*, 892 F.2d at 338. In our review we consider Biberfeld's factual assertions in the light most favorable to him. *Smith*, 892 F.2d at 338. We exercise plenary review over the district court's application of legal precepts. *Sullivan v. Cuyler*, 723 F.2d 1077, 1082 (3d Cir.1983). We find that Biberfeld has alleged facts entitling him to relief; that he has not waived his right to have them heard; and that an evidentiary hearing is necessary to test their truth. Hence, we will reverse the order of the district court in part, affirm in part, and remand the cause for an evidentiary hearing.

## I.

A federal jury convicted Biberfeld on each count of a 12 count indictment arising out of government procurement contracts between his company, Surgical Instruments Company of America ("SICOA")[1] and the United States Defense Logistics Agency ("DLA"), and between SICOA and the United States Veterans Administration ("VA").[2] Count 1 charged Biberfeld and SICOA with conspiracy to defraud the DLA and VA by, *inter alia*, failing to reveal on their bids for procurement contracts that the surgical instruments they were to supply would be made in part in Pakistan. Counts 2 through 5 charged Biberfeld with wire fraud, alleging that Biberfeld made several overseas telexes to further his alleged procurement fraud. Counts 6 through 10 charged Biberfeld with knowingly and wilfully making false statements in five separate contracts submitted to the DLA, concealing the fact that the place of performance for the production of surgical instruments was Pakistan. Counts 11 and 12 charged defendants with wilfully making and presenting false claims for payments under two separate DLA contracts.

The DLA contracts with SICOA were subject to the Buy American Act, 41 U.S.C. §§ 10a–10c, which authorizes the DLA to give preference to manufacturers and suppliers located in the United States and NATO member countries. Thus, DLA contracts incorporate a clause, referred to as "K–39," requiring bidding companies to certify the country where their goods originate, that is, all places where the goods and their component parts are manufactured

---

**1.** SICOA is not before us in this appeal.

**2.** For reasons discussed *infra,* our discussion is limited to Biberfeld's convictions connected with the various DLA contracts, i.e., Counts 6 through 12, and not with any VA contracts. We do not disturb the conspiracy and wire fraud convictions that are based solely upon the VA contracts.

and assembled. The K–39 clause also requires bidders to list all suppliers and their locations.

SICOA successfully bid on several contracts to supply surgical instruments to the DLA. Biberfeld, however, failed to disclose the true origin of the surgical instruments. He led the government to believe they were manufactured by Perfect Chirurgical ("Perfect") in Germany, a NATO member country. In fact, SICOA's instruments were manufactured by G.T. Surgical Limited ("G.T. Surgical") in Pakistan, a non-NATO country. G.T. Surgical manufactured the instruments and shipped them to SICOA through Perfect. Some of these instruments were stamped "Made in Germany" and others were intentionally left unstamped.

Biberfeld did not disclose the Pakistani origin of the instruments he supplied or that he had a second-tier supplier. Indeed, he affirmatively concealed the true origin of the instruments by sending false telexes designed to make it appear that Perfect was the only manufacturer, and by marking the surgical instruments with a false point of origin.

At trial, Biberfeld contended that although the language of K–39 required a contractor to list all manufacturers and second-tier suppliers, he believed that the DLA did not enforce the clause. *Appellant's Appendix* at 195–96. In addition, Biberfeld testified that he believed DLA practice allowed him to protect his sources of supply from his competitors by omitting sensitive supplier information from his bids and contracts. This belief was based on advice allegedly given Biberfeld by administrators in the Defense Personnel Support Center ("DPSC"), a branch of the DLA. *Appellant's Appendix* at 129–31. Thus, he claimed to be complying with what he thought was standard DLA practice.

The government's only witness testifying about DLA practice regarding the K–39 clause was William DiLauro, the DLA procurement officer who was responsible for reviewing bids and awarding contracts during the time period in the indictment, and who approved Biberfeld's DLA contracts. The government offered DiLauro's testimony for the purpose of showing DLA practice and procedure in awarding contracts. *Appellant's Appendix* at 106. DiLauro had many years experience awarding contracts for the DLA, and testified about bidder disclosures required before the DLA awarded a contract.

DiLauro testified at trial that K–39 requires a bidder, without limitation, to list all plants where any work would be performed on a particular item, regardless whether he is bidding as a dealer or manufacturer. *Appellant's Appendix* at 116. When asked what procedures would be followed when a bidder such as SICOA omitted information about second-tier suppliers or left the K–39 portion blank, DiLauro testified:

> [T]he buyer [DLA] would normally go back and ask SICOA for that information, because we were required, I have to show that place of performance in the contract award and also provide it to the Food and Drug Administration before I can make an award to any firm.
>
> ... When I go to present my proposed award to our board, our legal people, when they go through our bids, check to make sure that all the representations, all the clauses are filled out, and if it is not filled out, then we go back and ask for this information.

*Appellant's Appendix* at 112–113 (emphasis added). Significantly, DiLauro testified that DLA contracts would *not* be awarded if the information was not provided by the bidder. *Supplemental Appendix* at 153–56. Biberfeld's testimony flatly controverted DiLauro's description of what information the DLA required in the K–39 clause.[3]

---

3. When questioned about how he was instructed about bid solicitations, Biberfeld testified:

Q. ... Did anyone at DPSC discuss the method of completing the place of performance [K–39] clause with you?

A. [Biberfeld] Yes. The information that was here is the information that I was told was sufficient, and we did have a discussion regarding the confidential portion.
... I did express concern about disclosing my source to our competitors, and they pointed this

Before and during trial Biberfeld made *Brady* requests for other DLA contracts in the government files, but was given only the SICOA contracts. Appellant's Appendix at 41. The prosecutor claimed he could not release other contracts because they were protected from disclosure by the Privacy Act. Defense counsel vigorously cross-examined DiLauro, but did not allege his testimony to be perjured. Biberfeld was convicted on all counts of the indictment.

After his trial and conviction, Biberfeld requested from the government copies of all DLA contracts awarded during the period 1981–1988 under the Freedom of Information Act. He received copies of the contracts, but only after we had affirmed his convictions on direct appeal and the Supreme Court had denied *certiorari*.

Biberfeld's Freedom of Information Act inquiry revealed that DLA custom and practice was not as DiLauro had testified at Biberfeld's trial. Rather, the DLA contracts illustrated that the DLA regularly awarded procurement contracts without regard to whether second-tier manufacturers and suppliers were listed pursuant to K–39. Of approximately 2,500 contracts awarded by the DLA between 1981–1988, Biberfeld contends that none of these contracts specified second-tier manufacturers or suppliers in the K–39 clause. Indeed, numerous contracts were awarded with the K–39 clauses left blank. Many of these contracts were signed by DiLauro himself.

Acting on this discovery, Biberfeld deposed DiLauro again. When confronted with the contracts, DiLauro abandoned his trial testimony. *DiLauro Deposition*, Vol. III, at 190–91. DiLauro testified that it was not the government's actual practice during this time period to require full compliance with the K–39 clause.[4] DiLauro also stated that the acts upon which Biberfeld was convicted were understandable, not deceptive, and that a contractor would be justified in concluding it did not have to list second-tier subcontractors in response to clause K–39. *DiLauro Deposition*, Vol. III, at 175–76, 204–5. In contrast to his trial testimony, DiLauro asserted that Biberfeld properly completed the K–39 clauses in the DLA contracts that were the basis of his convictions. *DiLauro Deposition*, Vol. II, at 81–85.

## II.

Title 28 U.S.C. § 2255 permits a prisoner in custody under sentence of a federal court to move that court to correct an erroneous sentence. Under § 2255, the sentencing court is authorized to discharge or resentence a defendant if it concludes that it, "was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255.

The section also provides, in relevant part:

particular part of the clause out to me, or this paragraph, and suggested that I just put in a separate confidential letter, marked confidential.

.   .   .   .   .

Q. And in your conversation with the people at DPSC, was it suggested that there was anything improper or illegal about wanting to protect your source of supplies?
A. Not at all. That is the way I was told to do it.
*Appellant's Appendix* at 129–30.

4. When questioned by Biberfeld's counsel, DiLauro responded:
Q. Based on our review of these materials, is it your belief that there are contracting officers, buyers and attorneys within DPSC who do not believe that an offeror must identify every facility where an operation is performed in connec-

tion with the manufacture of an item being procured?
A. [DiLauro] Yes.
Q. Based on the materials we've reviewed, is it also your belief that there are many contractors who do not believe that they must list the facilities of subcontractors and lower-tier subcontractors in their response to K–39 Place of Performance DPSC 1979 June?
A. Yes.
Q. Is it also your understanding that there are contract specialists, contracting officers and attorneys at DPSC who do not believe that clause, K–39 Place of Performance DPSC 1979 June, requires a listing of subcontractors and lower-tier subcontractors?
A. Yes.
*DiLauro Deposition*, Vol. I, at 411–12.

Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law thereto. If the court finds ... that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C. § 2255.

■ A sentencing court's error of fact provides the basis for § 2255 relief if the error "constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Addonizio*, 442 U.S. 178, 186, 99 S.Ct. 2235, 2240, 60 L.Ed.2d 805 (1979), quoting *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962). If a prisoner's § 2255 allegations raise an issue of material fact, the court is required to hold an evidentiary hearing. *Walker v. Johnston*, 312 U.S. 275, 285, 61 S.Ct. 574, 579, 85 L.Ed. 830 (1941); *United States v. Costanzo*, 625 F.2d 465, 468 (3d Cir.1980), *cert. denied* 472 U.S. 1017, 105 S.Ct. 3477, 87 L.Ed.2d 613 (1985).

The district court reviewing Biberfeld's § 2255 motion found that the record conclusively showed Biberfeld was entitled to no relief. That finding rested on two grounds: (1) DiLauro's testimony was opinion, and thus did not create a fundamental defect in the trial, *District Court Memorandum and Order* at 7, *Appellant's Appendix* at 8; and (2) Biberfeld waived the perjury issue by not expressly raising it at trial or on direct appeal. *District Court Memorandum and Order* at 7–9, *Appellant's Appendix* at 8–10.

### A.

The first question is whether Biberfeld has alleged an error sufficiently fundamental to come within the narrow limits of § 2255 making his conviction vulnerable to collateral attack. *Napue v. People of Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). We hold that he has.

By alleging that DiLauro committed perjury, Biberfeld alleges facts which, if true, would demonstrate a fundamental defect in his trial. If a prosecutor uses testimony it knows or should know is perjury, it is fundamentally unfair to an accused. *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). The same is true when the government, although not soliciting false evidence, allows it to go uncorrected when it appears at trial. *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) *quoting Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177.

The government argues it did not actually know of any falsity in DiLauro's testimony, and thus even if it was false, Biberfeld is not entitled to relief. But for the limited purpose of deciding whether an evidentiary hearing is required, the prosecutor's actual knowledge does not matter. The touchstone of due process analysis is not prosecutorial misconduct, but the fairness of the trial. *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982).

Biberfeld alleges the prosecution had open access to DiLauro's files and coached him for 30–40 hours before he testified. During these meetings the files DiLauro reviewed before testifying were the ones presented to him by the U.S. Attorney. *Appellant's Appendix* at 115. Thus, from the record it appears that the prosecution had access to all relevant DLA contracts and files and directed DiLauro to the ones on which it desired testimony.

■ These circumstances, if true, make it highly probable that the prosecution knew DiLauro was lying at Biberfeld's trial. We hold that if the prosecutor had *access* to information that would indicate that a material witness is committing perjury, and when the perjured testimony creates a fundamental defect in the entire

trial, a hearing is required to determine what relief should follow. *United States v. Costanzo,* 625 F.2d at 470 n. 3. If, as alleged, both DiLauro's files and all DLA contracts were open and available to the prosecution, the prosecution is charged with knowing what the files contain, and with recognizing the potential for DiLauro's perjury and the effect that this would have at Biberfeld's trial. *Agurs,* 96 S.Ct. at 2400 ("If evidence highly probative of innocence is in [the prosecutor's] file, he should be presumed to recognize its significance even if he has actually overlooked it.")

Hence, we conclude Biberfeld is entitled to collaterally attack his convictions relating to his DLA contracts on this ground. *Hill,* 368 U.S. at 428, 82 S.Ct. at 471. Biberfeld's allegations of perjured testimony and the prosecutor's access to all relevant information concerning actual DLA practices, entitle Biberfeld to a hearing for the court to determine the facts, and if necessary fashion some relief.[5]

Biberfeld makes a second allegation of error. He claims the prosecution's failure to disclose other DLA contracts to him when he requested them represents a fundamental defect in his trial. Biberfeld is correct. This is because, if an accused requests the prosecution to disclose evidence favorable to him that is material either to his guilt or punishment, the prosecution violates process due him if it refuses or otherwise fails to disclose the evidence, irrespective of whether done in good faith or bad. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963).

If Biberfeld's non-disclosure allegations are true, the prosecution deprived Biberfeld of due process when it denied his *Brady* requests for the DLA contracts. Evidence affecting the witness' credibility is material to guilt or innocence, particularly when that witness is vital to the prosecution's case against the accused. *Giglio,* 405 U.S. at 153, 92 S.Ct. at 766. DiLauro's testimony was material to Biberfeld's credibility and struck at the very heart of Biberfeld's defense. DiLauro's testimony was prejudicial to Biberfeld's lack-of-intent defense because it directly affected one factual basis for Biberfeld's defense, namely, that the DLA did not enforce the K–39 clause. Biberfeld alleged he believed the K–39 clause was not enforced, did not believe it was necessary to disclose all suppliers and, therefore, did not intend to commit a fraudulent act. DiLauro's allegedly perjured testimony directly refuted Biberfeld's defense.

DiLauro's testimony was that DLA did enforce the K–39 clause. His testimony was likely to have carried great weight at Biberfeld's trial because DiLauro signed the contracts with Biberfeld on behalf of the DLA, and was the government's only witness on DLA custom and practice. In other words, the jury could believe either DiLauro or Biberfeld, but not both. It follows that evidence of the other DLA contracts would have not only impeached DiLauro's testimony, it could have, in equal measure, supported Biberfeld's defense. Thus, the government's refusal to provide other, potentially exculpatory, DLA contracts at Biberfeld's request was inherently unjust. *Brady,* 373 U.S. at 88, 83 S.Ct. at 1197.

The district court characterized DiLauro's testimony as opinion. This is correct only in part. In his capacity as the DLA's administrator, DiLauro testified about (1) what he thought the K–39 clause meant and (2) how the DLA implemented their understanding of the K–39 clause. While DiLauro's interpretation of the K–39 clause is opinion in some respects, DLA's custom and practice, including how DiLauro performed his duties, is testimony of fact.[6]

---

**5.** As indicated, we affirm the district court's determination that Biberfeld cannot now challenge his convictions relating to the fraudulent procurement of VA contracts, including his conviction for conspiracy. Because it is unclear from the record in this appeal whether any of Biberfeld's wire fraud convictions are now subject to collateral attack, on remand the district court will have to determine which of them, if any, were affected by DiLauro's testimony.

**6.** DiLauro testified that he regularly asked bidders about place of performance, that the DLA staff regularly checked place of performance,

The district court opined that Biberfeld had not established perjury. That, of course, was not a finding because the district court held Biberfeld waived his right to raise the perjury issue as a matter of law. It follows that if Biberfeld has not waived his right to allege perjury on collateral attack, he is entitled to an evidentiary hearing on his motion.

**B.**

■ Because Biberfeld never raised the perjury issue at trial or on direct appeal, he must show cause and actual prejudice or else his waiver will not be excused. *McCleskey v. Zant*, —— U.S. ——, ——, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991). When concluding that Biberfeld had not shown cause for his failure to allege perjury at trial, the district court cited *Brown v. United States*, 556 F.2d 224 (3d Cir.1977), for the proposition that knowledge of perjured testimony at the time of trial is fatal to Biberfeld's § 2255 claim. However, *Brown* said:

> Regardless of the knowledge of the government, if the information which is the focus of the petition was known to the defense *at a time when it could have been acted upon before the trial ended and if such fact is revealed by the record*, no evidentiary hearing is required under § 2255.

*Brown*, 556 F.2d at 227 (emphasis added). Thus, *Brown* holds that a defendant's knowledge of perjury coupled with his ability to act on it at trial is fatal to a § 2255 claim. The reason for coupling knowledge *with* ability is obvious. When two persons with full knowledge of an event offer opposing testimony, a logical conclusion is that one of them is lying, and if so, they both know whom. But it is not enough to say that defendant's knowledge of perjury at trial is sufficient to bar a later challenge based upon it. The simple reason is that at trial, although each knows the truth, all they can do is trade accusations. Conse-

quently, what is essential is the ability to act upon that knowledge. Here, the facts necessary to prove the alleged perjury—the non-SICOA DLA contracts—were denied Biberfeld. It would be fundamentally unfair to him to say that because he knew or believed at trial that DiLauro was lying, he can now be barred from asserting it. We hold that if a § 2255 movant can show that the factual basis for a perjury claim was not reasonably available to him or his counsel at trial, he has made a sufficient showing of cause to raise the perjury issue for the first time on collateral attack. *McCleskey v. Zant*, —— U.S. at ——, 111 S.Ct. at 1470 (movant's showing that the factual basis for a claim was not reasonably available to counsel at trial constitutes cause).

■ The factual difference between *Brown* and Biberfeld is that Brown knew about the perjury and could act at trial, while Biberfeld did not and could not. Brown was not entitled to collaterally attack his sentence because, at trial, he was aware of the *Brady* material and could then have easily obtained it. Biberfeld could not raise the perjury issue at trial because he had no proof of it. Any allegation of perjury at Biberfeld's trial would have been speculative, amounting to no more than suspicion of perjury. Without the other DLA contracts, Biberfeld lacked proof of DiLauro's perjury.

This case is analogous to *United States v. McCrane*, 547 F.2d 204 (3d Cir.1976), which was decided on direct appeal. McCrane was unaware until four days after the conclusion of his trial that certain letters existed indicating that a witness testifying on behalf of the government had received preferential treatment from the government. There, we held that because the prosecution denied a specific *Brady* request for material that could impeach a key government witness, McCrane was entitled to a new trial. Here, the government likewise denied Biberfeld's specific *Brady*

and that he had to regularly prove place of performance to the Food and Drug Administration before any contract was awarded. *Appellant's Appendix* at 112–13. Thus, DiLauro testified as to DLA practice awarding contracts. Bi-

berfeld has produced evidence that the DLA almost never checked place of performance. This is a dispute of material fact that needs to be resolved through an evidentiary hearing.

requests, and the material requested would almost certainly have impeached DiLauro. In addition, when Biberfeld contacted other governmental officials to elicit testimony from a source equal to DiLauro, none would disclose any information about governmental practices. *Appellant's Appendix* at 42. Biberfeld alleges that five contracting officials told him they had been told they did not have to talk to him and refused to do so. *Id.*

Since Biberfeld made a specific *Brady* request and no files were given him except his own, he could not establish the alleged perjury of a key government witness at trial, and has shown sufficient cause to collaterally attack his conviction. His knowledge or suspicion of perjury, without ability to act at trial, is not fatal to his § 2255 claim.

It is not difficult to conclude that, if DiLauro's trial testimony was false, the admission of this testimony at trial actually prejudiced Biberfeld. The standard we must follow is whether the alleged error "so infected the entire trial that the resulting conviction violates due process." *United States v. Frady*, 456 U.S. 152, 168–9, 102 S.Ct. 1584, 1595, 71 L.Ed.2d 816 (1982). Perjured testimony is material to a conviction if there is any reasonable likelihood that it could have affected the judgment of the jury. *Napue v. Illinois*, 360 U.S. at 271, 79 S.Ct. at 1178. If DiLauro's alleged perjury were before the jury, it is reasonably likely that the jury would have a very different picture of *actual* DLA practice regarding the K–39 clause, thus affecting the judgment of the jury with respect to the false statement counts, Counts 6 through 10, the false claims counts, Counts 11 and 12, and any of the wire fraud counts based solely on Biberfeld's DLA soliciting and contracting activity. Biberfeld has therefore satisfied his burden under *McCleskey*, by showing cause and actual prejudice, and is not now barred from raising the issue of DiLauro's alleged perjury.

### III.

In sum, Biberfeld is entitled to an evidentiary hearing to test the truth of his perjury allegations. We will reverse the order of the district court to the extent that it denies Biberfeld a § 2255 hearing on his convictions arising from his DLA contracts. We will remand for an evidentiary hearing on these convictions and direct the district court to fashion some relief if Biberfeld's allegations are true. We affirm the district court's order in all other respects.

MANSMANN, Circuit Judge, concurring.

I concur with the majority insofar as it remands this matter to the district court for an evidentiary hearing. Biberfeld has raised substantial issues that may merit collateral relief. I believe, however, that it remains the province of the district court to conduct an evidentiary hearing and develop the factual record with respect to the three elements set forth in *Jackson v. United States*, 338 F.Supp. 7, 10 (D.N.J.1971), *aff'd*, 455 F.2d 991 (3d Cir.), *cert. denied*, 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972), before any legal conclusions should be drawn. These three elements encompass: 1) the alleged perjury of the government witness DiLauro, 2) the materiality of DiLauro's trial testimony to Biberfeld's conviction, and 3) the Assistant United States Attorney's knowledge of DiLauro's alleged perjury.

Before the record is developed, I believe it is premature and improvident for us to comment on the merits of Biberfeld's claims. For example, the majority appears to accept, with brief analysis, Biberfeld's contention that the alleged DiLauro perjury was material to his conviction. Although I am unable to decide this issue because our appellate record is incomplete, I cannot dismiss the government's evidence that bears on this question. This evidence, unmentioned by the majority, suggests that while Biberfeld contends that he lacked specific intent to violate the law by not disclosing his Pakistani source in the K–39 clause, Biberfeld did recognize that he could initiate government investigations against competitors who, like he, did not reveal their Pakistani source in the K–39 clause. Evidence from Biberfeld's trial strongly suggests, as well, that SICOA's

West German subcontractor was a conduit that merely repackaged and in some instances stamped product as made in West Germany. Thus Biberfeld saved from disclosure his major manufacturer, unlike many of the instances to which DiLauro responded in his deposition. Finally, in order to meet government contracting standards, Biberfeld altered correspondence to and from his West German subcontractor and misrepresented that the West German subcontractor's facilities were capable of manufacturing. Biberfeld's fraudulent activities even culminated in allegedly bribing an Army official involved with a pre-award survey of his West German subcontractor. This conduct, as evidence of Biberfeld's knowledge and intent, must be factored into any determination of materiality.

For these reasons, I would simply vacate and remand to the district court to hear the evidence and evaluate it in its entirety without commenting on the merits of Biberfeld's claim.