**UNITED STATES of America, Plaintiff,**

**v.**

**Jaime GONZALEZ, Defendant.**

**Criminal Action No. 95–52 MMS.**

United States District Court,
D. Delaware.

Aug. 15, 1996.

Edmond Falgowski, Assistant United States Attorney, Department of Justice, Wilmington, Delaware, for plaintiff.

John S. Malik, Wilmington, Delaware, for defendant.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

### I. Introduction

The motion for a new trial before the Court has been brought by defendant Jaime Gonzalez ("Gonzalez" or "defendant"). On December 19, 1995, a jury found defendant guilty on two counts of an indictment, arising out of a fatal bombing which occurred in August, 1990. Subsequent to his conviction, but before sentencing, the Assistant United States Attorney who prosecuted the case turned over to the defense documents he had recently obtained from the United States Department of Justice ("Justice Department"). The documents contained certain allegations of, *inter alia,* unprofessional workplace conduct and unscientific analyses and were directed at certain personnel in the crime laboratory at the Federal Bureau of Investigations ("FBI"). Among the individuals named in the documents was Edward R. Bender ("Bender"), a former chemist at the FBI, who had been one of the government's expert witnesses in the present case. On the basis of those documents, defendant moved for a new trial.

1. On December 4, 1995, the government moved to dismiss Count II of the Indictment, and the

### II. Factual Background

On the morning of August 15, 1990, a bomb exploded at a trailer park located in New Castle County, Delaware, fatally wounding Julio Gonzalez (the "victim"). The bomb had been home-made, consisting of an electronically-triggered explosive device in a five-gallon kerosene can filled with a flammable liquid. Investigation and interviews with, among other persons, the victim's surviving common law wife, led state officials to consider defendant as the primary suspect. Defendant was indicted in the Superior Court of the State of Delaware in and for New Castle County on September 12, 1990 on several charges, including murder and arson. Trial commenced on April 23, 1991. On May 9, 1991, the jury found the defendant not guilty on all counts of the state's indictment.

On August 8, 1995, defendant was indicted in the United States District Court for the District of Delaware on three counts consisting of the following federal charges: (1) Interstate Transportation of an Explosive, in violation of 18 U.S.C. § 844(d); (2) Carrying an Explosive during the Commission of a Federal Felony, in violation of 18 U.S.C. § 844(h); and (3) Traveling in Interstate Commerce with Intent to Promote the Delaware State Offense of Arson, in violation of 18 U.S.C. § 1952.[1] After a three week trial, on December 19, 1995, a jury found defendant guilty on Counts I and III.

Bender testified on behalf of the government as an expert witness. Bender is a chemist in the Explosives Section of the Bureau of Alcohol, Tobacco and Firearms ("ATF"), specializing in explosives and trace materials analysis. He also held this position in August, 1990, the time at which the remnants of the explosive device used in this case were analyzed by ATF. Bender was called by the government to testify about the construction of the explosive device which he had devised using fragments of the bomb taken from the crime scene. On cross-examination, Bender stated that he compared the gray paint found on bomb remnants with a

motion was granted that same day. *See* D.I. 65.

can of gray paint found in defendant's basement, and concluded that the two paints were chemically identical. Bender testified about his comparison of pieces of solder attached to wires found at the crime scene to a spool of solder seized from defendant's basement, and determined that they were the same type of solder. He also identified the probable explosive material used as black powder, based on the presence of combustion compounds in an exploded pipe found at the crime scene.

Subsequent to conviction but before sentencing, the Assistant United States Attorney came into possession of certain documents from the Justice Department containing certain allegations of Frederic Whitehurst ("Whitehurst"), a Laboratory Examiner at the FBI. The documents consisted of 129 Bates-stamped pages containing allegations directed at Bender (the "Bender Documents"), who had previously been employed as a chemist at the FBI before he began his tenure at ATF. The substance of the allegations was that Bender and other laboratory personnel at the FBI had violated FBI laboratory analysis protocol, issued scientific opinions without proper empirical bases, and engaged in unprofessional workplace conduct.

The Bender Documents included allegations such as failing to follow FBI Materials Analysis Protocol in examining residue and trace materials; keeping an inordinately sloppy and dirty work environment in his laboratory; failing to wash and sterilize laboratory glassware to be used in lab analyses; rendering scientific opinions without a proper empirical basis for his conclusions; failing to label instrumental output from testing; being personally incompetent to testify as an expert in explosives analysis, and being part of the Explosives Unit of the forensic staff at ATF which is departmentally incompetent to offer expert testimony on explosives; making racial remarks in the workplace and using derogatory words to refer to African–Americans; and fabricating information and conclusions with no basis, causing scientifically incorrect conclusions. D.I. 93 at 7, 10, 16, 27, 30, 33, 47, 50–56, 59, 61–68.

The United States Attorney's Office, while taking the position that the Bender Documents did not constitute exculpatory material under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), nonetheless disclosed the documents to defendant. On the basis of the Bender Documents, defendant moved for a new trial on March 26, 1996 (the "Motion for a New Trial"). D.I. 87. In his Motion for a New Trial, defendant argues that the Bender Documents contain exculpatory evidence which is material to defendant's conviction, falling within the purview of *Brady,* and should have been disclosed prior to trial. D.I. 87. While defendant does not urge that the Assistant United States Attorney withheld the Bender Documents, since the prosecutor was not made aware of their existence until after the trial, defendant asserts that the prosecutor, as a representative of the United States government, is nonetheless responsible for revealing all exculpatory evidence, even if not personally known to him. *Id.*

### III. Analysis

#### A. *Bender's Trial Testimony*

At trial, Bender testified as an expert witness on several topics. Among those topics were (1) design and construction of the bomb; (2) electrical components and triggering device and how the device was armed; (3) chemical composition of the gray paint found on the kerosene can and of that found in defendant's basement in a milk crate; (4) presence of combustion compounds in an exploded pipe found at the crime scene, and identification of black powder found in defendant's basement; (5) possible manner in which the bomb could have been transported; (6) the chemical composition of certain pieces of solder attached to wire found at the crime scene; and (7) possible alternative uses for copper wires, pipes, and speaker wires. These topics were covered either on direct or cross-examinations.

##### 1. *Direct Examination*

On direct examination, the government primarily focused on the construction of the bomb, employing a diagram which indicated the component parts and overall design of the bomb. The government first asked Bender about the housing of the bomb, which

Bender described as a five-gallon KP Industries kerosene can. Transcript of Proceedings ("Tr.") at E–72. A Hershey's syrup can was used to house a battery pack containing six Radio Shack 9–volt Enercell batteries, which was wired to two General Electric momentary on-off switches. D.I. 99 at Exhibit ("Exh.") B and C. A one and one-half inch copper tube was wired with sixteen gauge speaker wire to the battery pack, in which a three-fourth inch steel pipe filled with black powder was contained. The three-fourth inch steel pipe was sealed on both ends with two U-brand end caps. The copper tube was capped with two one and one-half inch copper end caps. Both the pipe and battery pack were placed into the kerosene can, which was filled with an oil and gas mixture. *Id.* at Exh. B. Bender explained the function each piece served in creating an electrical circuit, including the positive and negative connections with the wires and batteries. Next, Bender identified the pieces and fragments found at the crime scene, and associated each piece to the reconstruction diagram he had just explained. E–76–82.

Next, Bender gave the measurements of the pipes and gauges of the wires used in the bomb. *Id.* at E–82–90. He identified certain fragments, including pieces of copper, wire tubing, copper wire, trimmings, copper jumper, yellow wire, and a refrigerator door switch. *Id.* at E–91–93. He explained how a refrigerator door switch is used to open or close an electric circuit, and how the act of picking the can up would cause the bomb to explode because the switch would cut out, allowing the current to flow. *Id.* at E–93–96. Bender testified that black powder was placed in the three-fourth inch steel pipe to ignite the bomb, based on the presence of combustion compounds of black powder in the pipe. *Id.* at E–96–97. Bender identified the refrigerator switches as General Electric switches, which he had learned by contacting a representative at General Electric, who sent him an exemplar. *Id.* at E–98. Finally, Bender explained how the battery pack functioned, where the wires were attached and how the switch was connected to it. *Id.* at E–102–07.

2. *Cross–Examination*

On cross-examination, defense counsel asked a series of questions regarding the wiring of the device, including the function of the refrigerator switch. *Id.* at E–107–115. In that connection, defense counsel inquired as to whether one or two switches would have been required to serve the purpose. Counsel was attempting to show that inasmuch as only one switch would have been necessary to open the circuit, the person who constructed the bomb, which contained two switches, was not an expert in electronics. This would provide an inference that defendant, an electrician by profession, was not the creator of this particular bomb.

Defense counsel then asked a series of questions relating to how the bomb would have been armed, whether by a remote control device, a delayed explosion mechanism, or otherwise. *Id.* at E–117–127. Bender explained that "there's no way of knowing for sure," that "there's a couple of ways you could probably do it," and then explained it in terms of "if I was going to arm this device." *Id.* at E–119–20. Bender explained that the switches would have to remain depressed to keep the bomb from exploding, and that could be accomplished by carrying the device on some type of flat board and then setting it on the ground and carefully removing the board from underneath. *Id.* at E–120.

The following day, defense counsel's questions were designed to provide an inference that the victim himself constructed the bomb. He showed Bender a photograph of a flat wood board found at the victim's house and asked if that particular board could have been used to transport it. *Id.* at F–4–6. He showed Bender a photograph of a bucket of tools belonging to the victim, which Bender had seen during defendant's 1991 state trial, and asked whether Bender had analyzed these tools, and whether these tools might have been used to cut the various pieces of copper pipe and wires used in the bomb. *Id.* at F–7–14. Counsel asked Bender about some adhesive tape found on the battery pack, and asked whether Bender had analyzed it. Bender indicated that he had not, since he had no other tape to which it could

have been compared. Counsel then pointed out what appeared to be a roll of adhesive tape in a photograph of the victim's work van. *Id.* at F–36–37. In that same photograph, counsel asked Bender to identify speaker wire used to wire the speakers in the work van, relating that to Bender's testimony that speaker wire had been used to connect the battery pack to the explosive portion of the bomb. *Id.* at F–15–16. While Bender could not specifically identify any of the items in the photograph, he generally concurred with counsel's identification of each item. *Id.* at F–15–17.

Next, counsel asked Bender to speak hypothetically about what certain types of wire could be used for, such as hooking up a doorbell or rewiring a lamp, and where they could be purchased. Counsel showed Bender photographs of defendant's basement, and asked Bender to identify certain items found there, requiring Bender to make a "wild guess" about a particular electronic device, *Id.* at F–24, and then asking Bender how that unknown device might be wired. *Id.* at F–25. He asked Bender about Bender's knowledge of mercury switches, whether they could have been used in the device, and to identify springs found in defendant's basement. He then inquired about the explosive properties of black powder as compared to that of match heads, which were used in a pipe bomb found in a filing cabinet in defendant's basement. *Id.* at F–30.

Defense counsel's next line of questions were designed to show the inconclusivity of the investigation and of Bender's analyses. He first asked about the chemical properties of black powder. Bender stated that he had tested two samples of black powder taken from defendant's basement, but he was never asked about the results of his tests. *Id.* at F–34. Counsel asked about tests conducted on certain gray paint which was used to paint the kerosene can. F–37. Bender testified that he conducted a chromatograph of paint found on a bomb fragment as well as paint from a can found in defendant's basement, and stated his conclusion as follows:

> Counsel for Defendant: And you had determined that what was utilized on that piece of fragment from the explosive device was a gray spray paint; is that right?
>
> Bender: Yes.
>
> Q. Now, as far as making an identification as to whether that gray spray paint was a Krylon brand spray paint or a Rustoleum type of brand spray paint, is it fair to say that you were unable to do that in your analysis?
>
> A. To say specifically what kind of paint it was?
>
> Q. Yes.
>
> A. No.
>
> Q. Now, we know that we have Krylon spray paint that appears in Government's Exhibit 12. So while you—again, I have had the paint that appeared on Government's Exhibit 4, this portion of the can— you were unable to conclude that any of those cans of spray paint that were taken from my client's basement was a positive, identical match to the spray paint that appeared on that fragment; is that right?
>
> A. No, that is not correct. In fact, I analyzed these paint samples, and this can here, the Dove Gray can, the paint was the same kind of paint.
>
> Q. When you say it was the same kind of paint, you are indicating that the paint that appeared on Government's Exhibit No. 4 was gray spray paint?
>
> A. Yes.
>
> Q. And you obviously had determined that the can that is in Government's Exhibit 12 entitled Dove Gray is also gray spray paint; is that correct?
>
> A. Right.
>
> Q. But you were unable to say whether the gray spray paint contained in that Krylon can is the same identical spray paint that appears on Government's Exhibit 4; is that correct?
>
> A. I could not specifically say that this can painted that gray paint, no.
>
> Q. Is it fair to say that it is equally plausible that a can of Rustoleum gray spray paint could have applied the gray paint to that can fragment?
>
> A. I am not sure of what the chemical composition is of Rustoleum, but it is possible.

Q. It is possible.

*Id.* at F–38–40.

Counsel also asked about tests Bender performed on some wire strippings taken from defendant's basement and whether he was able to identify the manufacturer:

Counsel for Defendant: I believe you had said that ... some of the items that were brought to you included various types of wire strippings?

Bender: Right. The strippings from the insulation I was referring to, like the yellow ones that you placed in front of me.

Q. Right. That is again, not the wire itself, but the outer coating; is that correct?

A. Right.

Q. And is it fair to say that there are various wire manufacturers who utilize the same colors, red, green, yellow, black, white, for wire insulation?

A. That is fair to say, yes.

Q. And through your analysis, are you able to identify a particular wire insulation with a particular manufacturer?

A. No.

Q. So the wires that were found in portions of the explosive device, we are unable to say whether they came from the same manufacturer as some of the wire strippings that were found in Jaime Gonzalez' basement; is that correct?

A. That's correct.

*Id.* at F–40–41. Counsel then suggested that the inconclusivity of the analyses were exacerbated by the failure of law enforcement to ever consider that the victim constructed the bomb:

Q. Another area—I know you just analyzed what was brought down to you. But do you recall whether the New Castle County Police brought down to you any items at all, any tools, any supplies, wire strippings, pipes, that were taken from the workshop of the Brandywine Apartments where [the victim] was employed as a maintenance man?

A. No, I don't recall receiving anything from there.

Q. Is it also the case that you did not receive any type of tools, supplies, work scraps, wire strippings, from the maintenance shop of the Winterset Farms Mobile Home Trailer Park, where [the victim] was previously employed?

A. No, I did not.

Q. Lastly, is it also your testimony that you did not receive any items for comparison purposes that existed or were found in [the victim's] van; is that correct?

A. That's correct.

*Id.* at F–41–42. Finally, Bender explained that he had not analyzed certain white paint and a caulking tube from the victim's work van, referring to prior testimony that the bomb had been covered with a white sticky substance, because he had nothing to compare it to. *Id.* at F–42–43.

### 3. *Re–Direct*

On redirect, no new topics were discussed. In reference to the introduction of testimony about a pipe bomb found in a filing cabinet in defendant's basement, the Assistant United States Attorney asked Bender about the design of the pipe bomb. *Id.* at F–45–46. To rebut the suggestion that Bender's failure to test the victim's tools was symptomatic of a shoddy investigation, the Assistant United States Attorney also asked whether it is useful to attempt to reconstruct the bomb using items not found at the crime scene, such as those found in the victim's work van, and Bender responded that it was not useful for investigative purposes. *Id.* at F–46–49. The Assistant United States Attorney asked about possible means to transport the bomb, *id.* at F–56–57, use of jumper wires, *id.* at F–59–60, the presence of solder, *id.* at F–60–61, and the tests performed on the gray paint, *id.* at 53–54.

Assistant United States Attorney: Now, you had an opportunity to do a comparative analysis between the can of Dove Gray spray paint, Government's Exhibit—what is the number there, sir, is that 12 on that box?

Bender: This is Government's Exhibit 12.

Q. And also the piece of can with some gray paint on it, Government's Exhibit No. 4; is that right?

A. Yes.

Q. After conducting your chemical analysis, were you able to come to a conclusion as to the difference or similarity between the chemical composition of these two items?

A. Yes, they were the same.

Q. The chemical composition of the paints, those are the same?

A. Yes.

*Id.*

### 4. *Re–Cross*

On re-cross, defendant asked about solder analyses conducted by Bender. Specifically, counsel asked whether Bender had compared solder found in defendant's basement with solder found on wire fragments found at the crime scene. Bender testified that the two solders were of the same type, but was unable to say what brand of solder it was.

### B. *Standard for Motion for a New Trial*

 Federal Rule of Criminal Procedure 33 provides that a defendant may move for a new trial within two years after final judgment based on newly discovered evidence. Fed.R.Crim.P. 33. A defendant bringing a *Brady* challenge is entitled to a new trial where there is a reasonable probability that if the evidence had been disclosed to the defense, the result of the proceedings would have been different. *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987); *United States v. Price,* 13 F.3d 711, 721–22 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1372, 131 L.Ed.2d 227 (1995); *United States v. Perdomo,* 929 F.2d 967, 971 (3d Cir.1991). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (quoting *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. *United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976).

### C. *Brady Material*

 In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, the Supreme Court held that a defendant's due process right to a fair trial is violated when the prosecution withholds evidence that is both favorable to the accused and "material to either guilt or to punishment." *Id.* at 87, 83 S.Ct. at 1197. In addition to disclosing exculpatory evidence, the prosecution's duty under *Brady* also extends to evidence which might be used for impeachment purposes. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Pelullo,* 14 F.3d 881, 886 (3d Cir.1994). However, impeachment evidence, alone, is not *Brady* material; it must be favorable and, if disclosed and used effectively, it may make a difference between conviction and acquittal. *Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380–81; *Carter v. Rafferty,* 826 F.2d 1299, 1305 (3d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988). With respect to the materiality of impeachment evidence, the Supreme Court observed:

> When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule [of *Brady* ]. We do not, however, automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict[.]" ... A finding of materiality of the evidence is required under *Brady....* A new trial is required if "false testimony could ... in any reasonable likelihood have affected the judgment of the jury...."

*Giglio,* 405 U.S. at 154, 92 S.Ct. at 766 (citations omitted) (*quoted in Carter,* 826 F.2d at 1305); *see also Pelullo,* 14 F.3d at 886. A defendant bringing a *Brady* complaint must allege the following elements: (1) the prosecution must suppress or withhold evidence; (2) the evidence must be favorable; and (3) the evidence must be material to the defense. *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). The Court will address each element seriatim.

### 1. Did the Prosecution Withhold Evidence?

Defendant does not contend that the Assistant United States Attorney suppressed or withheld *Brady* material in his possession. Instead, defendant alleges that the FBI had conducted an investigation into the Whitehurst allegations prior to trial, during which the allegations against Bender surfaced, and the information in the possession of the FBI is deemed to be in the constructive possession of the United States Attorney's Office, another agency of the United States government. D.I. 92 at 6. While it is undisputed that the Assistant United States Attorney did not withhold evidence from the defense that he had in his *actual* possession, the Third Circuit Court of Appeals does not draw a distinction between different agencies in the same government for the purpose of this inquiry. *Perdomo,* 929 F.2d at 970. Thus, information in the possession of one government agency is deemed to be in the constructive possession of the others. Therefore, the government must disclose material, exculpatory evidence to the defense whether in its actual or constructive possession. *See United States v. Veksler,* 62 F.3d 544, 550 (3d Cir.1995), *cert. denied sub nom. McNaughton v. United States,* — U.S. —, 116 S.Ct. 780, 133 L.Ed.2d 731 (1996); *United States v. Thornton,* 1 F.3d 149, 158 (3d Cir.), *cert. denied,* 510 U.S. 982, 114 S.Ct. 483, 126 L.Ed.2d 433 (1993).

### 2. Was the Evidence Favorable to the Defense?

The government does not dispute that the Bender Documents contain evidence that is favorable to the defense, and this inquiry need not detain the Court. Evidence that can be used to impeach a government's witness is deemed to be favorable to the defense for the purpose of *Brady. Perdomo,* 929 F.2d at 971 ("We agree that the favorability of the evidence is unquestionable. [The witness'] undisclosed criminal record constitutes exculpatory evidence that the defense could have used to impeach [him] on cross-examination."). Accordingly, the Court turns its attention to the materiality requirement, the dispositive issue in the case.

### 3. Was the Evidence Material to the Defense?

Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383–84. A reasonably probability is a probability sufficient to undermine confidence in the outcome. *Pennsylvania v. Ritchie,* 480 U.S. at 57, 107 S.Ct. at 1001 (quoting *Bagley, supra*). Defendant argues that Bender's failure to follow protocols could have led to cross-contamination of materials, and that paint analysis and electronics to which Bender testified are both beyond the scope of his expertise. Defendant argues that because he was denied the Bender Documents, he was unable to test the basis of Bender's conclusions regarding the triggering mechanism. The government argues that the Bender Documents are not material because Bender's testimony was beyond impeachment, the Bender Documents are inadmissible at trial, and most of the testimony to which defendant objects was elicited by the defense on cross-examination and was beyond the scope of direct. These arguments raise issues which cannot easily be disassociated with one another. Rather than discuss each argument separately, the Court will first discuss issues pertaining to admissibility, and then turn to issues pertaining to impeachment.

#### a. Admissibility

The government argues that the Bender Documents are not "material" for the purposes of *Brady* because the evidence is inadmissible at trial. Before evidence can be deemed "material" for *Brady* purposes, it must be shown that the evidence would have been admissible at trial. *Wood v. Bartholomew,* — U.S. —, —, 116 S.Ct. 7, 10, 133 L.Ed.2d 1 (1995) (per curiam). In *Wood,* — U.S. —, 116 S.Ct. 7, the defendant was charged with first degree murder in connection with a robbery of a laundromat and fatal shooting of the attendant. The defendant's theory of the case was that the gun had accidentally discharged, twice, during the robbery of the laundromat. *Id.* at —, 116

S.Ct. at 8. The prosecution had failed to disclose the results of certain polygraph tests given to two witnesses, during which each was asked about his or her involvement in the crime for which the defendant was being prosecuted. The results of the first witness' test were inconclusive, although the examiner expressed his opinion that her responses were truthful. *Id.* at ——, 116 S.Ct. at 9. The results of the second witness' test indicated deception. *Id.* Neither set of results was disclosed to the defense. Under state law, polygraph results were inadmissible both as substantive and impeachment evidence.

The appellate court had found that although the evidence was not admissible for any purpose at trial, defense counsel "would have had a stronger reason to pursue an investigation" of the allegedly deceitful witness' story had he known of the results. *Id.* at ——, 116 S.Ct. at 9. The appellate court further found that defense counsel "might well have succeeded in obtaining an admission that [the witness] was lying about his participation in the crime" and "would likely have uncovered a variety of conflicting statements which could have been used quite effectively in cross-examination at trial." *Id.* at —— – ——, 116 S.Ct. at 9–10. The Supreme Court reversed, rejecting not only the notion that the information could have been used at trial, but also the idea that knowledge of the information could have led to admissible evidence, stating:

> The information at issue here, then—the results of a polygraph examination of one of the witnesses—is not "evidence" at all. Disclosure of the polygraph results, then, could have had no direct effect on the outcome of trial, because respondent could have made no mention of them either during argument or while questioning witnesses. To get around this problem, the Ninth Circuit reasoned that the information, had it been disclosed to the defense, might have led respondent's counsel to some additional evidence that could have been utilized. Other than expressing a belief that in a deposition [the witness] might have confessed to his involvement in the initial stages of the crime—*a confession that itself would have been in no way inconsistent with respondent's guilt*—the Court of Appeals did not specify what particular evidence it had in mind. Its judgment is based on mere speculation, in violation of the standards we have established.

*Id.* at ——, 116 S.Ct. at 10 (emphasis supplied). The Court noted that in light of the defendant's trial strategy, it was "difficult to see, then, on what basis the Ninth Circuit concluded that respondent's counsel would have prepared in a different manner, or (more important) would have discovered some unspecified additional evidence, merely by disclosure of polygraph results that, as to two questions, were consistent with respondent's pre-established defense." *Id.; see also United States v. Oxman,* 740 F.2d 1298, 1311 (3d Cir.1984) ("In order to be material, evidence suppressed must have been admissible at trial."), *vacated on other grounds sub nom. United States v. Pflaumer,* 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985); *see also United States v. Phillip,* 948 F.2d 241, 249 (6th Cir.1991) ("Certainly, information withheld by the prosecution is not material unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes."), *cert. denied,* 504 U.S. 930, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992); *United States v. Kennedy,* 890 F.2d 1056, 1059 (9th Cir.1989) (same), *cert. denied,* 494 U.S. 1008, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990).

In order to determine whether the allegations in the Bender Documents would be admissible at trial, the Court must refer to the Federal Rules of Evidence. The Bender Documents contain the following topics which gave rise to allegations against Bender:

(1) Failing to follow FBI Materials Analysis Protocol in examining residue and trace materials found on explosive fragments and in examining residue and trace materials found in areas where an explosive device had been detonated. D.I. 93 at 33, 59.

(2) Keeping an inordinately sloppy and dirty work environment in his laboratory which resulted in a high probability of contamination or cross-contamination of

physical evidence to be analyzed by Bender. *Id.* at 7, 10, 16, 47, 50, 52–53.

(3) Failing to wash and sterilize laboratory glassware to be used in lab analyses which resulted in a high probability of contamination or cross-contamination of physical evidence to be analyzed by Bender. *Id.* at 33.

(4) Rendering scientific opinions without a proper empirical basis for his conclusions. *Id.* at 30.

(5) Failing to label instrumental output from testing performed in connection with analysis of physical evidence. *Id.* at 53.

(6) Being personally incompetent to testify as an expert in explosives analysis, and being part of the Explosives Unit of the forensic staff at the ATF which is departmentally incompetent to offer expert testimony on explosives. *Id.* at 55–56, 61–68.

(7) Making racial remarks in the workplace, including jokes about the facial features of African Americans, use of derogatory words to refer to African Americans, and use of racial references to cases involving African Americans. *Id.* at 3, 19–20, 27, 53.

(8) Using racist and sexist remarks in the workplace in reference to an African American female chemist who had been chosen to attend a forensic training class sponsored by the FBI. *Id.* at 27.

(9) Fabricating information and conclusions with no basis, causing scientifically incorrect conclusions, as evidenced by Bender's responses to questions asked at a seminar at which he was speaking. *Id.* at 61.

In order for these documents to be deemed material for *Brady*, they must first be deemed admissible under the Federal Rules of Evidence. The allegations contained in the Bender Documents fall into two categories: (1) evidence of Bender's character, including topics six, seven and eight, set forth above; and (2) anecdotes of specific instances of alleged unprofessionalism, including the remainder of the topics set forth above. The Court will first determine which, if any, of the allegations would be admissible for impeachment purposes at trial.

Impeachment evidence is governed by Federal Rule of Evidence 608, which provides:

Rule 608. Evidence of Character and Conduct of Witness

(a) Opinion and reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) *the evidence may refer only to character for truthfulness or untruthfulness,* and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

(b) Specific instances of conduct. *Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility,* other than conviction of crime as provided in rule 609, *may not be proved by extrinsic evidence.* They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) *concerning the witness' character for truthfulness or untruthfulness,* or (2) concerning the character of truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Fed.R.Evid. 608 (emphasis supplied).

Application of Rule 608(a) would preclude admission of topics six, seven and eight. That Bender may be regarded as a racist or a sexist individual by others is precisely the type of character evidence Rule 608(a) is designed to prohibit, as it is not in any way probative of Bender's character for truthfulness or untruthfulness.

Application of Rule 608(b) would prohibit the admission of the remaining topics. Allegations pertaining to instances in which Bender failed to follow FBI Materials Analysis Protocol, kept a sloppy work environment, failed to wash or sterilize glassware, and failed to label instrumental output, constitute extrinsic evidence of specific instances of conduct not germane to Bender's truthfulness or untruthfulness, which is pro-

hibited by Rule 608(b).[2] Evidence in topic four that Bender rendered a scientific opinion without a proper empirical basis pertains to a specific case on which Bender worked during the 1980s, and is therefore extrinsic evidence of a specific instance which Rule 608(b) prohibits. Similarly, the subject matter in topic nine does not only refer to a specific instance of conduct, but it is merely a response to a hypothetical question Bender was asked at a seminar.[3] Clearly, topic nine would not be admissible at trial, not only because it is extrinsic evidence relating to a specific instance of conduct, but, as a hypothetical, its relevance would be seriously questionable.

Defendant, relying on a Fifth Circuit decision in *United States v. Opager*, 589 F.2d 799 (5th Cir.1979), argues that all of the nine topics contain admissible evidence. In that case, a cocaine distribution prosecution, one of the government's witnesses testified that he had worked with the defendant in the past and had witnessed the defendant using and selling cocaine. Defense counsel attempted to impeach the witness by offering business records from the employer which would prove that the witness and the defendant had not worked together. The Fifth Circuit appellate court held that the district court erred by excluding the records, because the records were introduced to disprove a specific fact material to the accused's defense. "We consider Rule 608(b) to be inapplicable in determining the admissibility of relevant evidence introduced to contradict a witness' testimony as to a material issue." *Id.* at 802.

Defendant argues that this case is similar to *Opager, supra.* He argues that the allegations would not be offered to impugn Bender's character, but merely to "rebut a material issue which the prosecution attempted to prove at trial through circumstantial evidence, namely, that the forensic analysis of the explosive device, its components and trace materials indicated beyond a reasonable doubt that Defendant Gonzalez manufactured the explosive device...." D.I. 108 at 5. Defendant further argues that "since the allegations directly refute Bender's purported scientific qualifications as an explosives expert and his analytical methods, they contradict Bender's trial testimony concerning an issue material to Defendant Gonzalez' guilt or innocence." *Id.*

The Court disagrees. Even if this Court were to adopt the Fifth Circuit's reasoning, the result would be different. In *Opager*, the witness was testifying as an eyewitness to the very events which form the basis of the criminal prosecution; *i.e.*, testimony that defendant sold cocaine in a cocaine distribution prosecution. In this case, however, Bender did not testify in any way against defendant, nor did he proffer any testimony which would contradict defendant's theory of the case. Bender's direct testimony related to the construction of the bomb and matching constituent parts from the crime scene to the reconstruction of the bomb. At no time did Bender's testimony implicate defendant. Obviously, the government's case *as a whole* implicated defendant, but not Bender. Thus, unlike *Opager*, the extrinsic evidence in this

2. Assuming without deciding that failure to follow laboratory protocol, sloppiness in the workplace, failure to sterilize glassware, and failure to label instrumental output could be considered habit evidence, governed by Rule 406, the Court's ultimate conclusion does not change. Even if this evidence were admissible under Rule 406, not all admissible evidence is material, and *Brady* only requires material evidence to be disclosed. *See Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383–84; *United States v. Hill*, 976 F.2d 132, 135 (3d Cir.1992). As the discussion *infra* indicates, the Bender Documents do not contain material evidence for the purpose of *Brady*.

3. At the seminar, Bender was asked:
 Question: Uh, Ed, if you're looking at an overall scene and you're trying to determine, you've positioned yourself for looking for an

emulsion or you're looking for one of the higher explosives, you've come across the scene, how do you basically attack what your procedure will be once you get back to the laboratory.... If you could just touch on how you, once you're back at the lab, what do you do?
 Bender: OK, one of the things that we will do like in that particular case, uh, when I looked at it, it looked like a military explosive.... I would approach it looking for PETN, RDX, HMX, and so on. I would not look for ammonium nitrate.... Uh, I could look for, if I saw any residual material in there, I'd say, Hey there might be something else in there but once I identified the explosive that fits the scenario, I'm finished....
 D.I. 93 at 62–63.

case is not relevant evidence which would be introduced to contradict a witness' testimony as to a material issue. *See Opager,* 589 F.2d at 802. Contrary to defendant's assertions, Bender offered no testimony on direct which was "material to Defendant Gonzalez' guilt or innocence." D.I. 108 at 5. Throughout the case, defendant did not dispute the construction of the bomb—he only disputed the builder.

Defendant further argues that the allegations regarding Bender's sloppy work environment and failure to follow FBI protocol for forensic analysis would have been admissible in challenging the weight to be given Bender's "scientific findings and conclusions." *Id.* at 6. First, until defense counsel brought out, on cross-examination, the results of the paint analysis and the solder analysis, there were no "scientific findings and conclusions" to be accorded more or less weight by the jury. As noted above, Bender merely engaged in an explanation of the bomb's construction. To the extent that this may be characterized as a "scientific finding," it was largely irrelevant. It was sufficient for the jury's purpose to know simply that it exploded. Bender's description of how the bomb was wired or built did not go to defendant's guilt or innocence.

Similarly, Bender's testimony regarding the presence of combustion residues in pipe found at the crime scene did not go to defendant's guilt or innocence. The only reason the jury ever heard about the paint and solder analysis is because defense counsel brought them out on cross-examination. Counsel's present complaint that he could have more successfully impeached the very evidence he brought out on cross-examination if he had the Bender Documents is more appropriately deemed the result of counsel's tactical decision to bring the analyses into evidence rather than the prosecution's failure to disclose exculpatory evidence.

In conclusion, the nine subject areas of allegations against Bender contain evidence of bad character, not probative of truthfulness or untruthfulness, and is inadmissible under Rule 608(a), and evidence of specific instances of conduct not germane to truthfulness or untruthfulness, which is prohibited by Rule 608(b). Because this evidence is inadmissible, it is, by definition, not material for the purpose of *Brady.*

Defendant, in the alternative, argues that even if the evidence was inadmissible, it could lead to the discovery of admissible evidence. The Supreme Court addressed this argument in *Wood,* —— U.S. ——, 116 S.Ct. 7. There, the Ninth Circuit had agreed with the defendant's argument, that notwithstanding the fact that the evidence at issue was inadmissible, it could have led to the discovery of admissible evidence. The Court rejected the conclusion, because "the Court of Appeals did not specify what particular evidence it had in mind. Its judgment is based on mere speculation, in violation of the standards we have established." *Id.* at ——, 116 S.Ct. at 10. Similarly, defendant in this case does not specify what other information could possibly have been discovered which he would use to impeach Bender in furtherance of his own theory. In any event, as the next section indicates, impeachment evidence arising out of the allegations contained in the Bender Documents would nonetheless be immaterial for *Brady* purposes, in light of Third Circuit appellate decisions on materiality and in light of the weight of other evidence against defendant.

### b. *Impeachment Value*

The government argues that Bender's testimony was beyond impeachment, in that most of the topics to which he testified were easily verified by the jury or concerned evidence which could have been explained by another witness. The government also argues that most of the testimony about which defendant complains was elicited on cross-examination rather than on direct. Related to both arguments is the fact that nothing contained in Bender's direct testimony incriminated the defendant. Bender simply identified the constituent parts of the bomb, matched fragments, and explained the triggering device. *See* Part III(A), *supra.* At no point did the government ask Bender if he knew who made the bomb. Bender's testimony related to how the bomb was made, not who made it.

As emphasized previously, the defense's theory of the case was not that the bomb was

not made, but *that the bomb was not made by defendant.* Therefore, defendant would have no reason to impeach Bender's testimony regarding the construction of the bomb. For example, impeaching Bender's identification of a kerosene can would not add to defendant's case. The jury could see for itself that the bomb had been housed in a kerosene can. Impeaching Bender's reconstruction of the battery pack would also not add to defendant's case. The exploded battery pack was found at the crime scene and was independently introduced into evidence. Impeaching Bender on the operation of a refrigerator switch would not add to defendant's case. The only incentive to impeach Bender that defendant would have is if Bender, at any point in his testimony, in some way associated the constituent parts with the defendant. However, Bender made no such associations.

After direct examination, defense counsel pursued two avenues of impeachment of Bender's testimony. One line of questions was designed to suggest that the victim, rather than the defendant, constructed the bomb. Along these lines, counsel asked questions such as why Bender did not analyze certain tools of the victim, whether a certain piece of plywood found at the victim's house could have served as a transportation device, and questions suggesting that certain speaker wire, adhesive tape and white paint found in the victim's work van could have been used to build the bomb. The second line of questions was designed to show the inconclusivity of the investigation generally and of certain tests performed by Bender specifically, including the solder, paint and black powder analyses. All of these questions were outside the scope of direct and were asked without objection by the government. Because Bender had made some preliminary matches between the solder and paint found at the crime scene to solder and paint found in the defendant's basement, defense counsel sought to impeach Bender by demonstrating that Bender could not make brand name matches.

The issue, stated simply, comes down to this question: can defendant successfully argue the Bender Documents are material when that which he seeks to impeach was not introduced at trial by the government, but rather, by defendant himself? Stated another way, given defendant's theory of the case that the victim constructed the bomb, can defendant argue that he was denied *Brady* material relating to Bender's explosives and trace materials analysis when the government never introduced these analyses at trial, nor used the expert for any purpose other than reconstructing the device? The answer must be in the negative.

These questions must be evaluated against the background that defense counsel attempted to use Bender to prove his theory that it was equally plausible that the victim constructed the bomb, and that law enforcement failed to provide any of the victim's tools for analysis. In *United States v. Pflaumer,* 774 F.2d 1224 (3d Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986), the defendant alleged a *Brady* violation arising out of the government's failure to disclose an immunity agreement with a witness in exchange for that witness' testimony. *Id.* at 1229. The court first noted that the witness in question was merely one of several witnesses who testified to the defendant's involvement of certain fraudulent transactions. *Id.* at 1230. The court distinguished the case from those in which the witness about whom information was withheld was only one of two incriminating prosecution witnesses. Further, the court noted that defense counsel himself availed himself of that portion of the witness' testimony which actually *supported defendant,* and in closing argument, relied on the witness' testimony in support of his defense. *Id.*

In the same way, defense counsel in the present case took advantage of the fact that Bender was testifying by cross-examining him on subjects which were not introduced into evidence by the government. Counsel attempted to demonstrate, through Bender, a consistent failure on the part of the investigating team to consider the notion that the victim himself constructed the bomb. Counsel used Bender to present to the jury the fact that the victim had all the constituent parts of the bomb in his possession. Coun-

sel also used Bender to present to the jury the notion that there were other uses to which defendant could have put those same constituent parts. Counsel also attempted to highlight the inconclusivity of the entire investigation, caused by factors such as law enforcement's failure to supply Bender with materials from the victim for testing, and Bender's failure to make precise identifications of paint, solder, and black powder. Those alleged failures were emphasized and commented upon by counsel. Thus, like defense counsel in *Pflaumer,* counsel used the witness about whom *Brady* material was allegedly suppressed to further his own case.

Defendant seeks to overturn his conviction on the ground that evidence he could have used to impeach testimony *he brought out on cross-examination* was withheld. In effect, defendant seeks to have it both ways: he wants to introduce evidence the government chose not to introduce, to further his case by demonstrating problems with the investigation, and he also wants to impeach the same evidence he brought in because the evidence turned out to be less favorable for defendant than he had hoped.

What the government sought to accomplish with Bender's testimony was the reconstruction of the bomb and identification of its constituent parts. Later, testimony would be introduced by another witness, testifying, for example, that receipts were found in defendant's basement for speaker wire, pipes, end caps, and a kerosene can, all of which were items used to build the bomb. It would be through that person's testimony that the jury would conclude that the pieces Bender identified as being part of the bomb were purchased by defendant.

Notwithstanding this tactical decision, defense counsel chose to bring in testimony about the paint and solder analyses through Bender. Even assuming *arguendo* that the Bender Documents would have led to the discovery of information which demonstrates that Bender had cross-contaminated paint samples in the past, the Court is at a loss to understand how this testimony would be useful to impeach what Bender offered on direct. The government did not include any of Bender's analyses as part of its case. What Bend-er stated in his direct testimony would have been beyond impeachment for the purposes of defendant's case; because *how* the bomb was constructed is not relevant to the issue of *who* constructed the bomb, whether it was the victim, the defendant, or any other person. It is simply impossible to fathom how Bender's direct testimony could have been impeached by the allegations contained in the Bender Documents.

Applying the *Bagley* test for materiality, the Court must determine if the evidence had been disclosed to the defense, there is a reasonable probability, a probability sufficient to undermine confidence in the outcome, that the result of the proceedings would have been different. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383–84; *Perdomo,* 929 F.2d at 971. Materiality of impeachment evidence withheld by the prosecution in the context of *Brady* challenges has been considered by the Third Circuit appellate court on several occasions. Jurisprudence in this context has evolved clearly and consistently. Where the witness about whom information was withheld is the sole witness, or one of a small number of witnesses, who *directly incriminates defendant* or is critical *to rebut part of the defendant's case,* the information is deemed to be material. On the other hand, where the witness does not directly incriminate the defendant, or simply provides cumulative testimony, the undisclosed information about that witness is deemed to be immaterial.

The Third Circuit Court of Appeals has held that where impeachment evidence pertaining to the sole eye-witness of a crime is withheld, the evidence is material. In *Perdomo,* 929 F.2d at 971–72, the defendant was tried and convicted for possession of cocaine with intent to distribute, and two other cocaine-related distribution offenses. *Id.* at 968. The government's case against defendant consisted primarily of the testimony of its paid informant, to whom the defendant had sold the cocaine the previous month. *Id.* This paid informant had a criminal record which was not disclosed to the defense. That evidence which was not disclosed was deemed to be material because the government's entire case rested on the observations

of this witness to whom defendant sold drugs, and thus the jury's assessment of his credibility was critical. "[T]here is also a significant likelihood that the prosecutor's response to the defense's request for criminal background information induced defense counsel to believe that [the witness] could not be impeached because counsel assumed that he had no prior criminal record." *Id.* at 972. Inasmuch as the prosecution's case rested with that one witness, the impeachment evidence withheld was deemed to be material.

Similarly, in *Carter v. Rafferty,* 826 F.2d at 1299, the undisclosed evidence was an oral report made by a professor who administered a polygraph test to the government's witness which was inconsistent with a written report he subsequently submitted. The inconsistency pertained to whether the witness was inside a bar or on the street when the crime occurred, and was critical to the defense because if the witness had been indoors, his ability to observe the defendants running from the scene of the crime would have been questionable. The court found that the information was *Brady* material because the witness' "eyewitness identification was the only direct evidence" placing the defendants at the scene of the crime. *Id.* at 1309; *see also United States v. Starusko,* 729 F.2d 256, 261 (3d Cir.1984) (where witness is the "linchpin of the prosecution's case," a report which affects his credibility and illuminates question of substantive guilt is material for impeachment purposes); *compare, Pelullo,* 14 F.3d at 887 (impeachment evidence withheld concerning a witness who was one of three witnesses testifying about defendant's involvement in the crime was not material, because his testimony was cumulative).

Impeachment evidence pertaining to a witness whose testimony is offered to refute an element of the defendant's defense is also deemed to be material for *Brady* purposes. *United States v. Biberfeld,* 957 F.2d 98 (3d Cir.1992), a false claims, mail fraud and conspiracy case against a federal contractor, involved the defendant's request of copies of contracts awarded to other contractors during the period during which his alleged violations occurred. *Id.* at 101. The government refused to disclose the contracts on the ground that they were protected by the Privacy Act. *Id.* At trial, a government witness testified about the custom and practice of his agency, specifically, that the United States Defense Logistics Agency ("DLA") required federal contractors to list a certain type of manufacturer when awarded a government contract. *Id.* at 100. After the trial, defendant submitted a Freedom of Information Act request for copies of government contracts awarded during the relevant period, and discovered that the DLA did not, in fact, require such lists. *Id.* at 101. The court found that the government's failure to disclose the contracts was a violation of the defendant's due process rights under *Brady,* because the witness' testimony directly affected the intent element the government had to prove, the same element defendant attempted to show was lacking:

> [The witness'] testimony was prejudicial to [defendant's] lack of intent defense because it directly affected one factual basis for [defendant's] defense, namely, that the DLA did not enforce the [requirement]. [Defendant] alleged he believed the [requirement] was not enforced, did not believe it was necessary to disclose all suppliers and, therefore, did not intend to commit a fraudulent act. *[The witness'] allegedly perjured testimony directly refuted [defendant's] defense.*

*Id.* at 103 (emphasis supplied). The court concluded that the undisclosed contracts not only would have impeached the witness' testimony, but it would have, at the same time, supported the defendant's defense. Therefore, the government's refusal to disclose violated *Brady. Id., compare Wood,* —— U.S. at ——, 116 S.Ct. at 10 (noting that the withheld information was not material because the information was "consistent with respondent's pre-established defense.").

These cases must be distinguished from the cases which follow. In *Price,* 13 F.3d 711, the defendant appealed his conviction on grounds including an alleged *Brady* violation. Two government witnesses who testified against the defendant had made agreements with the Drug Enforcement Agency ("DEA") to receive payment for their testimony. *Id.* at 721. The government failed to disclose

the agreements to the defendant until after trial. The court found no *Brady* violation. *Id.* at 722. One of the witnesses never mentioned the defendant's name because he did not know the defendant. *Id.* The other witness' testimony against defendant was "very limited." *Id.* Further, that witness "did not mention [the defendant] until [the defendant's attorney] cross-examined him, when he said he knew him and had one unrecorded conversation with him." *Id.* The court also noted that the "volume of other evidence against the defendant was overwhelming," and thus "[c]onfidence in the outcome [was] not undermined." *Id.*

In *Thornton*, 1 F.3d 149, a companion case brought by a co-defendant of the defendant in *Price, supra,* the court reached the same conclusion. The same two witnesses who made agreements with the DEA testified against the defendant. As in *Price,* the government withheld the agreements from the defense. The court rejected the *Brady* challenge, noting that one of the witnesses did not provide any testimony, on direct or cross-examination, about the defendant. Likewise, the other witness did not implicate the defendant in any specific criminal conduct, and that witness did not even know that the defendant was a member of the drug distribution gang which was the subject of the conspiracy charges. *Id.* at 159. Thus, the court found that it was the strength of the government's case as a whole, rather than the testimony of these two witnesses, which led to the defendant's conviction, and concluded that there was no reasonable probability that the outcome of the trial would have been different had the evidence concerning the DEA payments to the witnesses been disclosed. *Id.*

In this case, Bender's testimony against defendant was even more limited than that in *Price.* Bender never mentioned defendant in an incriminating fashion, and like the witness in *Price,* never incriminated defendant by linking any of the components of the bomb to defendant until defense counsel cross-examined him in a manner calculated to cast doubt on the value of Bender's testimony. This case is different from cases finding materiality. No fair review of Bender's testimony

would lead to the conclusion that he was the "linchpin" of the government's case, or that he was one of only two witnesses who incriminated defendant. He was not the sole eyewitness linking defendant to the crime. More important, it cannot be concluded that Bender's testimony "directly refuted [defendant's] defense", as in *Biberfeld, supra.* In *Biberfeld,* the witness about whom *Brady* information was withheld was alone responsible for rebutting the defense's theory on lack of intent. In the case *sub judice,* however, defendant's theory was that he did not construct the bomb—rather, the victim did. Nothing Bender said was inconsistent with that theory until defense counsel decided to introduce the results from the paint and solder analyses. *See Wood,* —— U.S. at ——, 116 S.Ct. at 10 (noting that the undisclosed confession was immaterial because it was "in no way inconsistent with respondent's guilt").

Even without Bender's testimony, the case against defendant was overwhelming. In order to acquit defendant, the jury would have had to believe that the victim, for some unknown reason, constructed the bomb, placed it on his own front door steps, went to sleep while the armed bomb sat on his front door steps, and then suffered his demise when attempting to move it. Alternatively, the jury would have had to find reasonable doubt in the government's case. The trial took twelve days. The evidence was so massive that the jury arrived at its judgment of convictions on both Counts in three hours and twenty minutes, a time period which included the ordering and eating of lunch, as well as delay caused by submitting a procedural question to the judge. As the Supreme Court observed, "[i]t should take more that supposition on the weak premises offered by respondent to undermine a court's confidence in the outcome." *Wood,* —— U.S. at ——, 116 S.Ct. at 11.

The other evidence offered at trial against defendant was overpowering. The government introduced the testimony of Luck Kapshuck ("Kapshuck"), the victim's common-law wife. She testified that she and the victim had witnessed an automobile accident in 1988 in which defendant's wife Vivian was involved. *Id.* at B–41. Kapshuck and the

victim told the other driver that Vivian caused the accident, and offered to testify for the other driver about the accident. *Id.* at B–41–42. As a consequence, Kapshuck and the victim became involved in a heated argument with Vivian and defendant, which culminated in a physical altercation. *Id.* at B–41. Both Kapshuck and the victim suffered injuries which caused them to be admitted into the hospital. *Id.* at B–42. Subsequent to that incident, Kapshuck and the victim brought criminal charges against defendant for assault, and defendant was found not guilty. *Id.* at B–43. Kapshuck and the victim then filed a civil lawsuit against defendant, and that lawsuit was pending at the time the victim was killed. *Id.* Kapshuck also testified that one morning, she found a note on the windshield of her van, which read "Be very, very careful. You are not as safe as you think. A word in Spanish. 'Cuidate.'" *Id.* at B–55–56. "Cuidate" means "Be careful." *Id.* at B–56.

Diana Gonzalez ("Diana"), defendant's daughter, also testified for the government. Diana had been an alibi witness in defendant's state trial in 1991. In this trial, she recanted her testimony, and admitted to having perjured herself in 1991. In 1991, Diana was sixteen years of age, and had testified favorably for her father out of fear that if she did not, she would have been living "on the streets." *Id.* at F–130. She testified that on more than one occasion, she overheard Vivian tell defendant, after the automobile accident, that he "better not let [the victim] get away with it," referring to the victim's offer to testify for the other driver. *Id.* at F–120–21. She testified that one evening, defendant and Vivian picked Diana up at a nightclub to take her home, but took a detour through a trailer park in Delaware, and overheard Vivian say "that's where he lives." *Id.* at F–123. She then stated that on one night, she was asked to babysit her stepsisters, and she observed defendant in his basement workshop "doing something to a kerosene can." *Id.* at 126. Diana told him she knew what he was doing, and he told her not to tell anybody. *Id.*

The government also called Joseph Pastuszek, Sr. ("Pastuszek"). Pastuszek was the owner of a building and plumbing supplies company at which both Kapshuck and the victim had formerly worked. Pastuszek testified that defendant had come into his store on one occasion after Kapshuck and the victim had quit their jobs and moved to Delaware, and inquired as to the whereabouts of Kapshuck and the victim. *Id.* at C–7. Pastuszek stated that he told defendant where they had moved, and gave him the telephone number of the trailer park. *Id.* at C–8–9. The government then called Steven Magasich ("Magasich"), a salesman at the same building and plumbing supplies company. Magasich testified that on August 6, 1990, defendant had charged certain items on his in-store account. Among the items he charged were a five gallon kerosene can, a one and one-half inch copper end cap, two three-fourth inch nipple pipes, and four three-fourth inch end caps. *Id.* at C–31–32. The four end caps were especially significant, because the witness who testified after Magasich, Daniel Horsey, testified to finding two identical end caps at the crime scene, and two others in the defendant's basement workshop. Magasich testified that defendant's signature appeared on the bottom of the receipt. *Id.* at C–32. Magasich further testified that the kerosene can which sold for $9.99 was either an Eagle brand or a KP Industries kerosene can. *Id.* at C–30.

The next witness testifying for the government was Officer Daniel H. Horsey ("Horsey"). Horsey was the evidence technician, whose function was to collect and process physical evidence found at the crime scene. Horsey testified that he found at the crime scene a one and one-half inch copper pipe, flared out on both ends, and a one and one-half inch copper end cap. Inside the pipe was a three-fourth inch steel pipe. *Id.* at C–80. Horsey also found the bottom of the five-gallon kerosene can, in which two round circles had been cut out. *Id.* at C–79. Horsey also found the battery pack, comprised of nine-volt Radio Shack batteries, housed in a Hershey's syrup can. *Id.* at C–80. He also found two U-brand three-fourth inch end caps which had been exploded off the three-fourth inch steel pipe. *Id.* at C–105.

Horsey's testimony became more meaningful when Horsey testified as to the items he discovered in the defendant's basement workshop during a search of defendant's home. He stated he found two three-fourth inch U-brand end caps, *id.* at C–160–61, a milk crate full of spray paint, with a can of Dove Gray spray paint on top, *id.* at C–164, a spool of Radio Shack 16–gauge speaker wire, and a pair of wirecutters and wire-strippers. He also found, in a trash bag, a yellow plastic cap to a Hershey's syrup can, but the can itself was not in the trash bag. *Id.* at C–172. Also found in the trash bag were two metal circular cut-outs of approximately the same size as the two holes in the kerosene can found at the crime scene. *Id.* at C–172–73. He found a Radio Shack bag in the furnace room in the basement, *id.* at C–178, and a receipt from Radio Shack, dated August 10, 1990, for a spool of 16–gauge Radio Shack speaker wire. *Id.* at C–187–88. At that point, Horsey reiterated that the two U-brand end caps found at the crime scene had the same type of speaker wire protruding from them. *Id.* at C–188–89. Horsey also stated that he found a pipe bomb with the word "Explosive" or "Explosivo" written across it on a piece of tape, *id.* at C–122–23, a container of a mixture of gasoline and oil, marked "gasolina con aceite," *id.* at C–197, and at least two cans of black powder, *id.* at C–157–58.

The two circular metal cutouts from the trash bag were analyzed by a government witness named Raymond Keto ("Keto"), a forensic chemist, who worked at the Forensic Laboratory at ATF during the relevant period and tested items seized from defendant's basement. These cutouts were approximately the same size as the two holes which were made on the bottom of the kerosene can used to house the bomb. Keto's analysis was designed to examine the cutouts for trace elements in the metal for comparison purposes. His analysis indicated how may parts per million of each of sixteen trace elements were present in the metal cutouts. He then ran the same analysis on the KP Industries kerosene can which was used to house the bomb. He concluded that the metal of the cutouts and the metal of the kerosene can were "indistinguishable," but also conceded that

the cutouts would match any other can made in the same production run. *See* Tr. at F–75–84.

Perhaps the most damaging testimony the government offered against defendant was the testimony of John O'Neil ("O'Neil"), the Senior Firearms Tool Mark Examiner at ATF during the relevant period. His specialty involves microscopic analyses of markings left on pieces of evidence for the purpose of comparing the markings to those made by a sample cut by a particular tool. In this case, he analyzed the marks on the KP Industries kerosene can used to house the bomb, and compared them to the markings which were made when cutting the same metal with certain wirecutters and tin snips found in the defendant's basement. Along the edge of the holes in the bottom of the can were 24 slits, forming 23 small tabs. Any cut made leaves four distinct edges to analyze: left and right sides of the top of the item, and left and right sides of the bottom. O'Neil examined the four edges of each cut which formed the tabs. He was able to match all four sides of four of the slits to a pair of tin snips removed from defendant's basement "to the exclusion of any other tool." Tr. at E–148. He then testified about his examination of marks left on certain pieces of wires found at the crime scene, and the results of his comparison to wire marks left on sample cuts by a particular pair of wire cutters taken from the defendant's basement. Like the tin snips, the wirecutters leave four distinct edges per cut which allow for comparison. O'Neil was able to make conclusive matches between the cuts, stating that "[he was] positive that these two tools were used to cut the wire or the bottom of the can to the exclusion of any other tool made." *Id.* at E–154.

In summary, the case against defendant was overwhelming. Bender's testimony was not critical to the government's case, because how the bomb was constructed was never a disputed issue in the case. The remainder of the evidence, however, provided overwhelming circumstantial evidence of guilt. Thus, there is no reasonable probability that had the evidence been disclosed, the result of the trial would have been different, and confidence in the outcome has not been under-

**1218**

mined. Defendant's Motion for a New Trial will be denied.

### IV. Conclusion

Defendant has failed to present evidence sufficient to undermine confidence in his conviction. He has not demonstrated that had the evidence been disclosed, there is a reasonable probability that the outcome of his trial would have been different. Defendant's Motion for a New Trial will be denied. An appropriate order will be entered.